**CASE NO. 25-1171**

---

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

---

**DARRYL BROADNAX,**

Plaintiff-Appellant,

v.

**RHOMBUS ENERGY SOLUTIONS, INC.,**

Defendant-Appellee.

---

**ON APPEAL FROM**
The United States District Court
for the Eastern District of Michigan
Case No. 2:23-cv-11343
Hon. F. George Caram Steeh, District Court Judge

---

**CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT**

---

SUBMITTED BY:

Carla D. Aikens, Esq.
Carla D. Aikens, P.L.C.
615 Griswold Street, Suite 709
Detroit, Michigan 48226
carla@aikenslawfirm.com
844.835.2993
*Counsel for Plaintiff-Appellant*

1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... 3

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................................... 4

JURISDICTIONAL STATEMENT ........................................................................... 4

STATEMENT OF THE ISSUES ................................................................................ 5

STATEMENT OF THE CASE .................................................................................... 6

SUMMARY OF ARGUMENT .................................................................................. 15

STANDARD OF REVIEW ........................................................................................ 15

ARGUMENT ............................................................................................................... 15

CONCLUSION ............................................................................................................ 26

CERTIFICATE OF COMPLIANCE ....................................................................... 26

CERTIFICATE OF SERVICE .................................................................................. 26

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....................................................... 15, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 15, 18

*Cline v. Catholic Diocese of Toledo,* 206 F. 3d 651 (6th Cir. 2000) ............................... 16

*Ford v. Lowe's Home Centers, Inc.*, Case No. 07-cv-13303, 2008 WL 5273607 (E.D. Mich. Oct. 31, 2008) ........................................................................................................................ 20

*GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804 (6th Cir. 1999) ....................... 15

*Hittle v. City of Stockton*, 604 U. S. ____ (2025) (Thomas, J., dissenting) .................. 19

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)................................................. 18

*McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995)........................................ 17

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000)...................................... 18

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1983).................................................. 16

*State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433 (6th Cir. 2005)................... 15, 17

*Thomas v. Autumn Woods Residential Health Care Facility*, 905 F. Supp. 414 (E.D. Mich. 1995) ........................................................................................................................................ 20

*United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711 (1983)............... 16

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) .......................... 20

*Yashon v. Gregory*, 737 F. 2d 547 (6th Cir. 1984)........................................................... 16

**Rules**

Fed. R. Civ. P. 56.................................................................................................................. 19

Fed. R. Civ. P. 56(a)............................................................................................................. 15

## **STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellant believes that oral argument will aid the Court because the appeal turns on the proper application of summary-judgment standards to a factually rich record of discrimination, harassment, and retaliation.

## **JURISDICTIONAL STATEMENT**

The district court exercised federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. The court entered final judgment on February 3, 2025 granting Defendant's motion for summary judgment. Appellant timely filed a notice of appeal on March 22 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.  Whether the district court erred in granting Defendant-Appellee's Motion for Summary Judgment.

## STATEMENT OF THE CASE

1. Factual Background

### A.  Plaintiff's Short Time With Defendant

Plaintiff is an African-American Muslim man who was employed by the Defendant, starting on or about April 25, 2022, as a Production Manager. At the time of his hiring, Plaintiff's direct supervisor was Scott Stromenger. Plaintiff began to perform the duties and functions of his role under an introductory period.

Shortly after beginning in his role, Mr. Broadnax made a complaint to human resources ("HR") about Defendant's employee, Russel Pulter, using the term "colored" to describe African-American individuals. (ECF 20-3 at 22:23-23:16). Defendant's corporate representative, Courtney Davis, stated she "did not find any" support for the complaints that Mr. Broadnax brought against Mr. Pulter. (*Id*. at 23:23-24). However, Mr. Broadnax complained about the statement as well as Mr. Pulter's general abrasiveness, something other employees brought to HR's attention. (*Id*.). The representative also confirmed that Michael Macon heard Mr. Pulter use the term "colored" to describe African-Americans. (*Id*. at 24:7-23). Ms. Davis said this use of the word "colored" was not evidence because "[h]e was telling a story." (*Id*. at 25:16). Ms. Davis then quickly admitted this use of language was evidence of the complaint levied by Mr. Broadnax. (*Id*. at 25:17-20). This was not the only time racial slurs were said to Mr. Broadnax, as "Ken" was heard calling him the n-word. (ECF 23-1 at ¶46-48).

Plaintiff began to make a list of issues that either violated company policy or negatively affected performance, including but not limited to:

a. Employee attendance issues;

b. Poor work performance;

c. Phone usage while working; (ECF No. 20-10)

d. Dancing on a mechanical production floor; (ECF No. 20-10)

e. Using racially insensitive language; (*Id*.)

f. Opposing Mr. Pulter's documented abrasive nature; and (*Id*.) (ECF No. 20-3 at

page 23:1-5);

g. Respectfully bringing up wardrobe concerns while being called the n-word by

other employees. (ECF 23-1 at ¶¶46-48).

However, Plaintiff was stripped of any ability to do anything about it, as he had no power. (*See*

ECF No. 23-1)*.* Plaintiff was, unfortunately, treated like a "diversity" hire whom the company

would not allow to actually perform his role, as it sought to have him act as the "overseer" of

only the Black employees, whom Defendant did not respect but needed to run its company. (*Id*.)

The following week, Mr. Broadnax requested that an African American female employee

change her attire to be in compliance with the employee dress code. (*See* ECF No. 23-1). Scott

and Deane approached Mr. Broadnax and told him not to speak of the dress code to other

employees and he was sent home. Defendant did not give Plaintiff any autonomy in his role and,

upon information and belief, only hired him to supervise other African American workers

without giving him any authority whatsoever. (*See id.*)

After having spent less than two months on the job, Plaintiff was terminated via a text

message from Courtney, on or about June 22, 2022. A letter of termination was issued on the

same date. (*See* Defendant's Exhibit L; ECF No. 20-13). Plaintiff filed this lawsuit alleging

discrimination on the basis of religion, hostile work environment, retaliation, and disparate

impact on the basis of race. (ECF No. 1)

### B.  Defendant's "Facts" Presented in its Motion

In its Motion for Summary Judgment, Defendant-Appellee went to great lengths to try to present Plaintiff's character and managerial skills in a negative light, but this should not have obscured Defendant's behavior. Defendant relied heavily on Plaintiff's resume in its Motion for Summary Judgment, even though Scott Stormenger did not have Plaintiff's resume when he was first interviewed, as noted *infra*. Defendant tried to obscure that it only knew about the resume because Plaintiff *told* its attorney at his deposition. Stromenger was aware of what was on Plaintiff's resume because he had encouraged him to include some of his other experiences so that he could get hired and knew he had not worked at every place listed, including TRW. (ECF No. 19-5 at PageID.301). The simple fact is that Stormenger liked Plaintiff, wanted to hire him, and asked him to provide additional documentation to HR to hire him, even though Stormenger was already aware of his actual qualifications. (*Id*. at 37:5-24). Plaintiff went along with this and submitted the resume that Stormenger told him would pass muster. When asked where he worked in this case, Plaintiff truthfully provided the locations in his interrogatory responses. (*Id*. at 25:10-22). Apparently believing that the resume presented Defendant's best bet at getting away with its discriminatory practices by shifting the focus from its actions, Defendant's counsel continued to ask Plaintiff about the resume, to which he then admitted that he never submitted the resume at all until after he was interviewed by Scott, and that Scott had not received the resume from HR. (*Id*. at 37:12-22). Plaintiff confirmed after being asked again that when he submitted his qualifications, he put them in Indeed and did not submit a resume. (*Id*. at 38:3-7). Defendant's counsel asked yet again if Scott knew Plaintiff did not work at TRW, which he confirmed once again that he did. (*Id*. at 38:8-10). As Plaintiff confirmed when Defendant's counsel continued asking about it, Scott was only

concerned with having someone in the role who could help them "get the production floor

together":

> 13· ·Q· · Can you provide any further specifics about
> 14· · · · what you talked about, outside of what we've
> 15· · · · already discussed here today?
> 16· ·A· · No.· I mean, basically, he really wasn't
> 17· · · · concerned about that.· He was concerned about
> 18· · · · getting the production floor together and
> 19· · · · getting the rank and file employees in line.
> 20· · · · That's what he was concerned about.

(*Id*. at 43:13-20). It is unsurprising that Mr. Stormenger would later state otherwise, given

what it would mean for Rhombus' hiring practices. Though Defendant cited its handbook,

Plaintiff has stated that the person who interviewed and hired him – Scott Stormenger – knew

that he had not worked at TRW and otherwise was aware of his background, so there can be

no "false pretenses" where the recipient of the information is aware of the truth and simply did

not care because he needed someone in the position right away and he liked Plaintiff.

Defendant took it a step further by stating that Plaintiff failed to disclose that he had

been convicted of a non-violent felony nearly five years prior, as if: 1) he did not testify that

he had a discussion with several of Defendant's agents about this; or 2) Defendant did not

have the means to conduct a background check on him prior to hiring. As to the first point,

Plaintiff testified that he even called back after his interview to make sure it was OK:

> · ·A· · Well, I was kind of thinking about my past
> 14· · · · history, my felony record, so I called
> 15· · · · Deanne -- I mean, Courtney back and asked her
> 16· · · · would it be -- would that be a problem or would
> 17· · · · that hinder me from being hired.
> 18· · · · · · · · · · ·And she said, just discuss that
> 19· · · · with Scott.· She said she don't think -- she
> 20· · · · doesn't think it would be a problem as long as
> 21· · · · it wasn't a violent crime.· I believe that's

22· · · · what the line of questioning was or answer.

(*Id*. at 17:13-22). Plaintiff also told Scott and was reassured by Mr. Stormenger that it should not be a problem because they hire ex-felons. (*Id*. at 18:1-10). Plaintiff further testified that he told them about the conviction and probation because he knew that it would come up on a background check which he had given Defendant authorization to conduct. (*Id*. at 97:7-98:13). It is unlikely that Defendant did not check his background at all prior to hiring him. Again, it is not surprising that after being sued, Mr. Stromenger would deny that he had been told this, but Defendant made no effort to explain why it allegedly did not perform a standard background check if Plaintiff's background was of such concern.

Defendant further contended that Plaintiff was "incapable of leading and managing a manufacturing team" when the reality is that Defendant did not allow him to lead anyone. The examples of Plaintiff's lack of ability all tellingly relate to Plaintiff actually trying to do his job, and Defendant's agents telling him not to do so, as both Plaintiff and his colleague, Ms. Stephens, have attested. Defendant stated in his brief that he was terminated for the same thing he did at other jobs, though it has no evidence other than Plaintiff's own statement that these circumstances are the same. However, it declines to note that Plaintiff said these other jobs also discriminated against him. (*Id*. at 46:20-47:6). According to Defendant, examples of Plaintiff's "grievous ineptitude" – that it never presented to Plaintiff prior to this motion – included: 1) telling a woman to work instead of talking and dancing while on shift; 2) telling other employees to stay in line who did not report to him; 3) telling an employee to dress appropriately for work –which Defendant has now falsely called "harassed." Ironically, Defendant's Exhibit I actually perfectly depicts exactly what Plaintiff and Ms. Stephens have attested – that Defendant took away all of his autonomy and only wanted him there to give the

appearance of diversity rather than to permit him to do his job. Exhibit I begs the question what is it that Defendant actually wanted him *to* do? When he did his job, he was undermined, apparently counseled *not* to do it, and terminated.

Defendant even went as far as to use/coerce one of its own employees – who likely feared being terminated like Mr. Broadnax – state in an affidavit that was never produced during discovery that she does not believe Mr. Pulter is racist. Defendant's failure to present this affidavit earlier so that Plaintiff could depose her is obviously intentional, as Plaintiff would have been able to examine the circumstances under which this statement was provided.

### C.  Declaration of Takelia Stephens

Defendant went to great lengths to obscure its discriminatory practices which Ms. Stephens highlighted in her lengthy declaration (ECF No. 23-1). Unlike what is listed in Defendant's Exhibit I to its motion for summary judgment, which it never produced during the course of discovery, Ms. Stephens' detailed declaration actually perfectly aligns with Defendant's entire argument: Defendant gave Plaintiff absolutely no autonomy and only wanted him so that it could appear to honor diversity. As she stated in her declaration:

> 8. Most Black people there were too scared to say anything for fear of losing their job.
>
> 9. I talked to at least one co-worker about trying to work together to oppose how Rhombus was treating Black people, but no one else was willing to come forward.
>
> 10. In particular, Rhombus would not let Black people leave the production area, and they kept the area filled with almost all Black people only.
> …
>
> 18. When it became clear that Borg Warner was going to buy Rhombus, they started really separating us by race.

19. This included moving the white people (most of whom were the engineers) to another building entirely.

20. The only Black people that they kept in production were the ones they needed to
maintain the machines that they had.
…

27. While I worked there, I became aware that white employees – including one white male and a white female named Liz who started after me –was being promoted to lead and supervisor but were told by Rhombus management not to say anything.

28. One white employee told other Black employees what was going on, and that management was having side conversations with her and telling her not to tell the
Black employees, which caused tension with the Black people working there.
…

34. There was a production and quality manager, "Ken," who was of mixed race (Black and white).

35. He told us that Rhombus did not like Black people and that they used him to speak to them because he was both white and Black.

36. He would refer to the production area as a "dope house."
…

39. I recall the incident that caused Darryl Broadnax to be fired and I thought it was wrong and unfair.

40. I told Courtney in HR what I saw and that Darryl was just doing his job.

41. I was the only person who witnesses the interaction between Darryl and the woman he asked to change her clothes.

42. She was dressed inappropriately according to the company policy, because she was wearing a one-piece spandex jumpsuit and a jacket with holes in t, which looked more like attire one would wear to a night club.

43. I told Darryl that she was not supposed to be wearing that, and he nicely asked her to change her clothes.

44. People liked Darryl and he was trying to make sure that people were being treated fairly.

45. Once he started asking the Black people he supervised to follow the rules, the company turned on him.

46. Rhombus let the people on the floor who had been there the longest dictate what happened, because they needed the Black people to stay in that department and work, and they let them do anything they wanted because they had no expectations of the Black workers other than to work in production.

47. Rhombus seemed to understand that Black people there would work hard and not fight back if they were not being promoted, because people complained but were too scared of losing their job to say anything.

48. No representative of HR had even arrived at work yet when this incident happened with Darryl and the woman who was not dressed appropriately, and while we waited, Ken was calling Darryl the n-word which I thought was inappropriate.

49. I gave Courtney in HR my statement but despite that, they took the word of other people including Ken, even though I was the only person besides Darryl and the woman who actually witnessed what happened

50. Before hiring Darryl, Rhombus did not have any Black managers.

51. If you were Black and had authority, they would call you a "lead." …

As to another Black male who was hired, Ms. Stephens stated:

55. They only allowed him to do engineering with other white people when Borg Warner came.

56. He is, to my knowledge, the only Black engineer in the other building that they have hired.

57. This gentlemen was rewarded for not doing his job, because Rhombus

did not want him to have any actual managerial duties.

(*Id.*). She went on to describe the situation involving Mr. Broadnax and Defendant's overall environment as it sought to get acquired by Borg Warner:

> 58. I believe that they hired Darryl just to make it look like they had people in positions, because production did not really have supervisors until Borg Warner was coming in to acquire Rhombus.

> 59. The white people who worked for Rhombus were in another building, which were the engineers who did the testing.

> 60. The white employees could get away with dressing however they wanted, such as wearing Crocs, but when I wore them, I was written up.

> 61. It was clear that Rhombus only had Black people carrying out the "lower tasks" and it felt very weird to work in that kind of divided environment.

> 62. It was so awkward that it was unusual for a white person to see a Black person in the other building where they worked.

> 63. We would see a white production supervisor in the morning, and then would never see any other white people for the rest of the day.

> 64. One time an engineer came over to my area to visit a white employee who was working in production only temporarily – because he was quickly promoted despite having no experience.

> 65. The engineer gave me a very nasty look like he was disgusted I was there and stared at me.

> 66. I reported this to HR and Courtney told me that I should have spoken to him, even though he looked like he wanted to hurt me.

> 67. Rhombus did not do drug tests but when Borg Warner came into the picture, we were told that we could not smell like marijuana nor smoke it on the premises, which had been happening before.

> 68. I believe that Darryl was treated poorly and fired because he was Black and did not just "go along" like they expected Black people who

14

worked there to do.

## SUMMARY OF ARGUMENT

The district court's decision cannot stand. Viewing the record in Mr. Broadnax's favor—as Rule 56 requires—a reasonable jury could conclude that Defendant's actions were motivated by Plaintiff's race and his complaints.

First, the court erroneously found that Plaintiff presented a resume to Defendant that was "falsified." Whether Plaintiff was forthcoming in his qualifications for his position is a question of fact that is in dispute given evidence that Plaintiff has presented that he told the person interviewing him what his qualifications were. As such, the trial court should not have made a conclusion of material fact that is normally left to a jury and granted summary judgment.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, viewing all evidence—and drawing every reasonable inference—in the light most favorable to the non-movant. *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Denials of motions for reconsideration under Fed. R. Civ. P. 59(e) are reviewed for abuse of discretion, but a district court necessarily abuses its discretion when it commits a clear error of law or relies on clearly erroneous findings of fact. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999).

## ARGUMENT

15

I.      **Defendant Failed to Move for Summary Judgment on Plaintiff's Hostile Work Environment Claim**

For reasons that remain unclear, the trial court dismissed Plaintiff's claims for hostile work environment *sua sponte*, even though it noted Defendant did not move for the same. This was not proper, as Plaintiff had no opportunity to argue the same since Defendant did not move for summary judgment on this claim. *Yashon v. Gregory*, 737 F. 2d 547, 552 (6th Cir. 1984). Accordingly, Plaintiff was prejudiced by the Court's dismissal, and Defendant should have been required to move for summary judgment on all counts to which it believed it was entitled to do so.

II.     **Any Issue With Plaintiff's Resume Should Not Have Supported Defendant's Motion for Summary Judgment**

The district court incorrectly elevate the issue of Plaintiff's resume to find that he was not qualified for his position, as a matter of law. However, as this Court noted in *Cline v. Catholic Diocese of Toledo,* 206 F. 3d 651, 662-64 (6th Cir. 2000), citing U.S. Supreme Court precedent in *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983) and *St. Mary's Honor Center v. Hicks*, 509 US 502 (1983), consideration of qualifications is not a part of the prima facie case analysis under *McDonnell Douglas*, and it is to be considered only during the pretext analysis when assessing the legitimacy of the defendant's nondiscriminatory reason for its adverse action. Here, Plaintiff was not even terminated as a result of his resume, so at best, this evidence pertains to an after-acquired evidence that would affect his damages, and should not have been used to bar any portion of his claims on summary judgment.  Viewing the facts in a light most favorable to Plaintiff, it was simply not important to Defendant what was on his resume rather than that Plaintiff checked a box, and he did have relevant experience for his role.

Even in arguing Plaintiff's damages should be limited, Defendant misrepresents the holding of the U.S. Supreme Court in *McKennon v. Nashville Banner Pub. Co*., 513 U.S. 352 (1995). Defendant argued that page 361 of the McKennon decision supports its statement "where an employer can prove that it would have been entitled to terminate an employee for wrongdoing if it had known of the wrongdoing at the time of termination, the employee is barred from obtaining front pay and reinstatement, and backpay is limited." (ECF No. 19 PageID.250-251). However, that is not the holding from McKennon as the Supreme Court held "We do conclude that here, and as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy." McKennon, at 361-362. Defendant's citation changes the McKennon decision from a general rule to an absolute bar which is wholistically improper.

First, Defendant knew of Plaintiff's qualifications because Plaintiff told Scott Stormenger. Plaintiff notes that Defendant is hard-pressed to call Plaintiff fraudulent when Ms. Stephens has attested to the fact that Defendant was fudging its production so that it could be acquired by Borg Warner. (ECF No. 23-1 at ¶¶37-38). Based on the arguments contained above, Plaintiff maintains that he was terminated for performing within the role to the fullest extent; a fact supported by the Declaration of Ms. Stephens. (*See id*.). This improper termination was not actually based on a failure to perform in the role and as such Plaintiff's damages should not be limited.

### III.    Plaintiff Presented Evidence That Created a Genuine Issue of Material Fact

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law. *See State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005). Once the movant points to an absence of material factual disputes, the burden shifts to the

non-movant to identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The non-movant's burden is modest: she need only marshal evidence from which a reasonable jury could return a verdict in her favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000).

When the record is viewed through this required lens, substantial evidence supports each element of Plaintiff's claims, creating classic jury questions that preclude judgment as a matter of law. The finding that Plaintiff was not qualified for his position is a question of fact, where Plaintiff provided many facts to dispute that this was true, as noted herein. Defendant's version of events cannot be taken as dispositive of a situation; if it were, no plaintiff would ever be able to survive summary judgment where their employer would always present evidence to the contrary.

In a recent dissent, U.S. Supreme Court Justice Clarence Thomas expressed a desire to revisit the three-part burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In describing how *McDonnell Douglas* is being utilized improperly by district courts to grant summary judgment, and then affirmed by circuit courts, Justice Thomas noted that *McDonnell Douglas* was not intended for jury cases at all:

> Some confusion likely arises from the fact that the framework was not designed with summary judgment in mind. It was created as a tool for resolving the "ultimate question" in a Title VII case—that is, whether the defendant intentionally discriminated against the plaintiff. [*Texas Dept. of Community Affairs v. Burdine*, 450 U. S. 248, 253 (1981)]. But, when a defendant moves for summary judgment, the question for the court is not whether the defendant has in fact engaged in unlawful discrimination. Instead, the question is whether the plaintiff has proffered enough evidence to allow a reasonable factfinder to find a Title VII violation. *See* Fed. Rule Civ. Proc. 56(a).
>
> Because the *McDonnell Douglas* framework was designed for use in a bench trial, the language this Court has used to describe the

> framework does not neatly track the plaintiff's summary-judgment task. For example, the first step requires a plaintiff to "establis[h] a prima facie case." 411 U. S., at 802. And, the third step requires the plaintiff to show, "by a preponderance of the evidence," *Burdine*, 450 U. S., at 253, that the employer's stated reason "was in fact pretext" for discrimination, *McDonnell Douglas*, 411 U. S., at 804. But, a plaintiff need not establish or prove any elements—by a preponderance or otherwise—to survive summary judgment. At that stage, he need only offer enough evidence to create a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U. S. 317, 322 (1986).

*Hittle v. City of Stockton*, 604 U. S. ____, at slip op. 4 (2025) (internal citations omitted). As Justice Thomas pointed out, *McDonnell Douglas* was not intended to be the only manner in which discrimination could be demonstrated:

> Some courts also fail to appreciate that McDonnell Douglas is necessarily underinclusive. The framework sets forth criteria that, if satisfied, will allow a plaintiff to prove a Title VII violation. **But, satisfying *McDonnell Douglas* is not the only way or even the best way to prove a claim.** The *McDonnell Douglas* Court itself explained that "[t]he facts necessarily will vary in Title VII cases" and the prima facie proof required in one case "is not necessarily applicable in every respect to differing factual situations."

*id.* at slip op. 5 (internal citations omitted) (emphasis added). Justice Thomas further noted that the *McDonnell Douglas* standard was "made [] out of whole cloth" and not based in law. *Id.* at slip op. 3. Accordingly, Plaintiff respectfully requests that this Court take the opportunity to decline to overuse Federal Rule of Civil Procedure 56 to insulate corporations from a jury trial, which violates plaintiffs' constitutional right to a jury trial.

## IV.    Plaintiff's Discrimination Claims Do Not Fail

In its Motion for Summary Judgment, Defendant argued Plaintiff lacked the qualifications for the Production Manager position. This alleged lack of qualifications, Defendant argues, means that by default Plaintiff could not have performed the job to Defendant's satisfaction. (ECF No. 20 PageID. 386-87). First, Ms. Stephens' declaration aptly disputes that,

as both she and Plaintiff confirmed that Defendant had no intention of letting him do his actual job. (*see, e.g*., Plaintiff's Dep. Tr. at 9:18-23, ECF No. 19-5, Page.ID 318).

To support its arguments, Defendant cited to *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564 (6th Cir. 2003); *Thomas v. Autumn Woods Residential Health Care Facility*, 905 F. Supp. 414 (E.D. Mich. 1995); and *Ford v. Lowe's Home Centers, Inc*., Case No. 07-cv-13303, 2008 WL 5273607 (E.D. Mich. Oct. 31, 2008).

In *Wexler*, the Sixth Circuit Court of Appeals dealt with a case of an employee being demoted and having other adverse actions based upon his age. *Wexler*, 317 F.3d at 569, 578. There were multiple statements made by plaintiff's superiors regarding the plaintiff's age as well as complaints about declining sales. *Id*. at 568-69. Similar to the plaintiff in *Wexler*, Defendant was notified of racially insensitive language that Mr. Broadnax heard and confirmed through its own investigation. (ECF 20-3 at 22:23-23:20). Mr. Broadnax further mirrors *Wexler* because he did not have numerous written disciplines, counseling, or negative performance reviews. *See Wexler* at 568-69; (See ECF 20-12 PageID.489-90). In fact, the only discipline attached to Defendant's Motion comes from June 13, 2022 regarding the Brian Smith situation. (ECF No. 20-12 PageID.490-91). Notably, Defendant did not even ask Plaintiff about this during his deposition, and Plaintiff testified that Smith called him a derogatory name and a "b****." (Plaintiff's Dep. Tr. at 64:14-65:6, ECF No. 19-5, Page.ID 311). And Plaintiff was terminated on June 10, 2022. (Id. at 12:22-13:2, Page.ID 298).

*Thomas v. Autumn Woods Residential Health Care Facility* involved the termination of an employee with "eight written reports documenting individual instances in which Thomas violated" the duties set forth in her position. *Thomas*, 905 F. Supp. at 417. The plaintiff claimed that statements from her deposition were sufficient to establish a prima facie case of racial

discrimination; unlike the situation here where Mr. Broadnax has the sworn statement of an uninterested party. *Id*. at 418; (ECF 23-1). Unlike the plaintiff in Wexler, the plaintiff in Thomas had "twenty-six individual disciplinary reports issued to [her] during the course of her eight months at Autumn Woods" which were "strong evidence that [she] was not performing to the satisfaction of her employer." *Id*. at 420. Mr. Broadnax is not similar, as the only discipline attached to Defendant's Motion comes from June 13, 2022 regarding the Brian Smith situation. (ECF No. 20-12 PageID 490-91). As stated, this was *three days after he was terminated*, so it is unclear how this is relevant, if it is even real.

Defendant claimed Mr. Broadnax was being too aggressive in his disciplining of employees, but Mr. Broadnax only received a single formal or written discipline, a June 2022 discipline. (ECF No. 20-12 PageID.490-91). Unlike the plaintiffs in *Thomas* and *Ford*, Plaintiff did not have numerous negative reviews and formal disciplines. Mr. Broadnax had one discipline and Defendant's alleged "Chart Chronicling Behavior," attached as Exhibit I to Defendant's Motion (ECF No. 20-10 PageID.483-84), which should not have even been considered since it is hearsay not supported by any witnesses or citations to the record and was not produced in discovery. This is no way mirrors the plaintiffs' behavior in *Thomas* and *Ford*, where plaintiffs possessed numerous written disciplines and negative performance reviews – which, ironically, could themselves be evidence of discrimination.

In his Response to Defendant's Motion for Summary Judgment, Plaintiff responded to several of the hearsay statements listed in Defendant's Exhibit I (ECF No. 20-10):

- Defendant wrote "Mr. Broadnax stated Mr. Pulter was racist because Mr. Pulter used the phrase "colored" to describe African-Americans and using the phrase 'you folks' to describe the production area." (ECF No. 20-10 PageID.483)

    - It is undisputed that from the testimony of Courtney Davis that Mr. Pulter used the term colored. This term originated in the Jim Crow Era to refer to African-

Americans and can most assuredly carry massive negative or otherwise offensive connotations. Defendant's position essentially boils down to the use of racial slurs is okay as long as its in a story. A reasonable juror could determine that Defendant's failure to take any disciplinary action against Mr. Pulter supports Plaintiff's claims of discriminatory intent by the Defendant.

- Mr. Broadnax wanted to write an employee up because she was dancing on the floor. (ECF No. 20-10 PageID 483)

    o Plaintiff was overseeing production meaning that machines were running to create EV related charging stations and other technology. A reasonable juror could determine that such behavior is not appropriate and poses a safety risk when on the production floor, thereby validating Mr. Broadnax's attempt to discipline.

- Harassing a temporary employee regarding her attire. (ECF No. 20-10 PageID 483)

    o The declaration of Takelia Stephens, a former Final Quality Technician for Defendant, stated that this individual was dressed in a one-piece spandex jumpsuit and a jacket with holes "attire one would wear to a night club." Ms. Stephens brought it to Mr. Broadnax's attention and he "nicely asked her to change her clothes." (ECF No. 23-1 at ¶43). When this incident occurred no HR representative had arrived yet and "Ken was calling Darryl the n-word…" (*Id*. at ¶48). Ms. Stephens continued stating that she spoke with Ms. Davis in HR who took the word of Ken even though he did not witness the events. (*Id*. at ¶49).

Ms. Stephens affirmatively stated "[p]eople liked Darryl and he was trying to make sure that people were being treated fairly." (*Id*. at ¶44). She continued stating Defendant "… did not allow Black people in any position of authority to actually use any of their authority." (*Id*. at ¶ 52). This trend continued even if it was a Black employee's job and differed from how white individuals were allowed to operate in positions of power. (*Id*.) Simply put, there exists only one official discipline in the span of a month before the Defendant terminated Plaintiff, which differentiates Mr. Broadnax's case from *Thomas* and *Ford*. Mr. Broadnax is further differentiated from the plaintiffs in *Thomas* and *Ford*, as both plaintiffs had clear performance issues that had documented negative effects on production. That is not the case here as Defendant makes a general allegation that Defendant was losing the ability to maintain its workforce. (ECF No. 20

PageID.388). That assertion is only supported by a citation to Scott Stromenger's deposition and not by any official metrics like the plaintiffs in both *Thomas* and *Ford*.

**V.      Defendant's Alleged Reason for Termination is Purely Pretextual**

As noted in the previous section, Defendant could not show that Plaintiff's performance failed to meet the expectations within the role by documented evidence such as negative performance reviews and multiple disciplines. Defendant's basis for termination is also not supported by the record because only one discipline form exists for Mr. Broadnax. (*See* ECF No. 20-12 PageID 490-91). Interestingly, in its Motion for Summary Judgment, Defendant attempted to reclassify its Exhibit I as complaints against Plaintiff when it identifies on its Index as "Chart Chronicling Behavior." (ECF NO. 20-1 PageID. 397).6 Nothing in Exhibit I shows these are actual complaints against Mr. Broadnax by Defendant's employees.

However, if this Court finds that these do constitute complaints against the Plaintiff, then it would prove Plaintiff's claims as the situation involving Mr. Pulter using the term "colored" is listed in Defendant's Exhibit I. Essentially if the Defendant's own argument is believed, then the chart shows Plaintiff was blamed for Mr. Pulter's term of a racially insensitive term from the Jim Crow Era.

Defendant's termination letter does not support the Defendant's case either as it confirms that only one discipline was ever issued to Mr. Broadnax. (ECF No. 20-13 PageID. 493). Many of the listed reasons do not come with any explanation or identifying information. Further, the Defendant's argument that Plaintiff only has self-serving testimony does not hold weight when one considers Plaintiff's Exhibit A, the declaration of Ms. Stephens. In her affidavit she attests:

- Treated white employees better; (ECF No. 23-1 at ¶60)

- Fired Darryl because he was Black and did not just "go along" like Defendant

- expected Black people to do; (Id. at 68)

- Prevented Black people in authority from performing in their roles; (Id. at ¶52)

- Demeaning Black individuals in authority positions; (Id. at ¶51)

- HR refused to listen to her as the only witness to the incident which led to Mr.

- Broadnax's termination; (Id. at ¶39-44)

- Defendant allowed the production floor comprised of mostly Black employees to

- be referred to as a "dope house;" (Id. at ¶36) and

- Refused to discipline white employees; (Id. at ¶28-33).

This affidavit supports Plaintiff's allegations and narrative beyond his own "self-serving" statements. Ms. Stephen's statements support the narrative that Mr. Broadnax was attempting to do right by the policies in place and Defendant refused to support him as a Black manager. Further, Defendant did not attach a single written statement or document to support the statement that employees threatened to leave. (*See* ECF No. 19 at PageID.247). The only employee affidavit Defendant attached did not make any reference to that being the sentiment of Defendant's production employees. (ECF No. 20-11 PageID.486-87). Defendant relies on the testimony of Scott Stromenger, one of the people involved in the termination, to support what other employees felt at that time. (ECF No. 19 at PageID.247). Defendant's narrative was countered by evidence provided by the Plaintiff on this issue and as such summary disposition should have been denied.

**VI.    Plaintiff's Retaliation Claims are Properly Supported**

Shortly after beginning in his role, Mr. Broadnax made a complaint to HR about Russel Pulter using the term "colored" to describe African-American individuals. (ECF 20-3 at 22:23-23:16). Defendant's Corporate representative, Courtney Davis, stated she "did not find any"

support for the complaints that Mr. Broadnax brought against Mr. Pulter. (*Id*. at 23:23-24). However, Mr. Broadnax complained about the statement as well as Mr. Pulter's general abrasiveness, something other employees brought to HR's attention. (*Id*.). The representative also confirmed that Michael Macon heard Mr. Pulter use the term "colored" to describe African-Americans. (*Id*. at 24:7-23). Ms. Davis said this use of the term colored was not evidence because "[h]e was telling a story." (*Id*. at 25:16). Ms. Davis then quickly admitted this use of language was evidence of the complaint levied by Mr. Broadnax. (*Id*. at 25:17-20). This was not the only time racial slurs were said to Mr. Broadnax as "Ken" was heard calling Darryl the N-word. (*See* ECF No. 23-1 at ¶46-48). Ms. Stephens even reported this behavior to Ms. Davis, but nothing was done. (*Id*. at ¶48-¶49). Defendant's basis for termination is not supported by the records because only one discipline form exists for Mr. Broadnax. (*See* ECF No. 20-12 PageID.490-91). Defendant attempted to reclassify its Exhibit I as complaints against Plaintiff when it identified on its Index as "Chart Chronicling Behavior." (ECF NO. 20-1 PageID. 397). Nothing in Exhibit I shows these are actual complaints against Mr. Broadnax by Defendant's employees.

However, if this Court finds that these do constitute complaints against the Plaintiff, then it would prove Plaintiff's claims as the situation involving Mr. Pulter using the term "colored" is listed in Defendant's Exhibit I. Essentially if the Defendant's own argument is believed, then the chart shows Plaintiff was *blamed* for Mr. Pulter's term of a racially insensitive term from the Jim Crow Era. That alone would lend support to Plaintiff's retaliation claim as Defendant ignored multiple racially insensitive terms being used when it involved Mr. Broadnax.

25

## CONCLUSION

Plaintiff respectfully requests that this Honorable Court reverse the judgment below and remand for trial.

June 4, 2025                              Respectfully submitted,

                                          /s/ Carla D. Aikens
                                          Carla D. Aikens, P.L.C.
                                          Counsel for Plaintiff–Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7) because it contains 6,298 words, excluding the material enumerated in Rule 32(f), as counted by Microsoft Word.

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

                    /s/ Carla D. Aikens