No. 25-1171

**In the**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

_____

**DARRYL BROADNAX,**
*Plaintiff/Appellant,*

-vs-

**RHOMBUS ENERGY SOLUTIONS, INC.,**
*Defendant/Appellee,*

**On Appeal from the United States District Court**
**for the Eastern District of Michigan, Southern Division**
**Case No. 2:23-cv-11343 – Honorable George Caram Steeh**

_____

**BRIEF OF APPELLEE, RHOMBUS ENERGY SOLUTIONS, INC.**

_____

Elizabeth A. Favaro (P69610)
**GIARMARCO, MULLINS & HORTON, P.C.**
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, Michigan 48084-5280
(248) 457-7000

*Attorney for Defendant/Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

1.      Is Appellee a subsidiary or affiliate of publicly owned corporation?
Yes.

*Parent Corporation/Affiliate Name: BorgWarner*
*Relationship with Named Party: Parent Company*

2.      Is there a publicly owned corporation, not a party to the appeal with a financial interest in the outcome?
Yes.

*Parent Corporation/Affiliate Name: BorgWarner*
*Nature of Financial Interest: Parent Company*

# TABLE OF CONTENTS

**PAGE NO.**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

STATEMENT OF JURISDICTION....................................................................1

STATEMENT OF ISSUES ................................................................................2

STATEMENT OF THE CASE............................................................................3

SUMMARY OF THE ARGUMENT ....................................................................5

STATEMENT OF FACTS ..................................................................................7

    A.   The Production Manager's minimum job requirements .............................7

    B.   Broadnax did not have the minimal experience or education required for the job......................................................................................................8

    C.   Broadnax was terminated for poor behavior, performance, and policy violations...............................................................................................10

    D.   Proceedings below....................................................................................14

ARGUMENT: THE DECISION GRANTING SUMMARY JUDGMENT SHOULD BE AFFIRMED ................................................................................17

    I.   Standard of Review ..................................................................................17

    II.   The district court correctly determined that Broadnax failed to make out a prima facie case for discrimination.........................................................17

      A.   Broadnax failed to produce evidence or even argue that he was qualified for the Production Manager position......................................19

      B.   Broadnax failed to produce evidence that the company's stated reason for Broadnax's termination was pretextual............................................21

C.   The district court properly dismissed Broadnax's hostile work environment claim ..................................................................28

III.   The district court appropriately found that Broadnax's retaliation claim lacked the requisite causal connection between his alleged protected activity and his termination .......................................................32

CONCLUSION ....................................................................34

CERTIFICATE OF COMPLIANCE ....................................................35

CERTIFICATE OF SERVICE ..............................................................36

ADDENDUM ......................................................................37

APPENDIX ..........................................................................39

# <u>TABLE OF AUTHORITIES</u>

**PAGE NO.**

## Cases

*Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009)................................. 17, 18

*Central States, Southeast and Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506 (6th Cir. 2008) .....................................................17

*Chen v. Dow Chem. Co.*, 580 F.3d 394 (6th Cir. 2009) .........................................26

*Clay v. United Parcel Service, Inc.*, 501 F.3d 695 (6th Cir. 2007) ........................31

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000)................. 19, 20

*Cobbins v. Tenn. Dept. of Transp.*, 566 F.3d 582 (6th Cir. 2009)..........................24

*Davis v. City of Clarksville*, 492 Fed. App'x 572 (6th Cir. 2012)..........................27

*DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903 (E.D. Mich. 2008) .....24

*Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.*, 212 Fed. App'x. 558 (6th Cir. 2007).......................................................................................................30

*Excel Energy, Inc. v. Cannelton Sales Co.*, 246 Fed. App'x 953 (6th Cir. 2007) ................................................................................................................ 29, 32

*Gilty v. Vill. of Oak Park*, 919 F.2d 1247 (7th Cir. 1990) ......................................21

*Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008) ....................................................22

*Humenny v. Genex Corp.*, 390 F.3d 901 (6th Cir. 2004)........................... 18, 21, 22

*In re Rodriguez*, 487 F.3d 1001 (6th Cir. 2007) ....................................................33

*Kuhn v. Washtenaw County*, 709 F.3d 612 (6th Cir. 2013).............................. 16, 33

*McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973) ....................... 18, 19, 22

*Phillips v. UAW Int'l*, 854 F.3d 323 (6th Cir. 2017) ..............................................31

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599 (6th Cir. 2019)...................18

*Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. App'x. 421 (6th Cir. 2014) ..........31

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................25

*Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000)...........................27

*Smith v. Perkins Bd. of Educ.*, 708 F.3d 821 (6th Cir. 2013) ....................28

*Sperber v. Nicholson*, 342 Fed. App'x. 131 (6th Cir. 2009)......................17

*Suits v. The Heil Co.*, 192 Fed. App'x 399 (6th Cir. 2006) ......................23

*Thoma v. Warden, Pickaway Corr. Inst.*, Case No. 1:20-cv-282, 2020 WL
6318213 (S.D. Ohio, Oct. 28, 2020)......................................................25

*Thomas v. Autumn Woods Residential Health Care Facility*, 905 F. Supp. 414
(E.D. Mich. 1995) ..................................................................................23

*Trustees of Mich. Laborers; Dist. Council Pension Fund v. Van Sullen Const.,
Inc.*, 825 F. Supp. 165 (E.D. Mich. 1993) ............................................26

*Turcar, LLC v. I.R.S.*, 451 Fed. App'x. 509 (6th Cir. 2011) ....................30

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)............. 18, 23

*Williams v. CSX Transp. Co.*, 643 F.3d 502 (6th Cir. 2011) ....................31

*Yashon v. Gregory,* 737 F.2d 547 (6th Cir. 1984) ........................... 31, 32

**Rules**

Fed. R. Civ. Pro. 56.................................................. 6, 17, 32, 34

Fed. R. Evid. 201 ....................................................................25

Fed. R. Evid. 803 ....................................................................24

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant/Appellee Rhombus Energy Solutions, Inc. requests that this Court entertain oral argument to address any outstanding questions regarding the issues in this case and to ensure that this Court is properly informed before deciding this appeal.

## STATEMENT OF JURISDICTION

Plaintiff/Appellant Darryl Broadnax filed a timely Notice of Appeal on February 24, 2025 (not March 22, 2024, as his opening brief states) from the district court's Opinion and Order granting Rhombus's motion for summary judgment and dismissal. (Notice of Appeal, R. 28, PageID.605). Rhombus does not contest jurisdiction.

## <u>STATEMENT OF ISSUES</u>

**I.   Did the district court correctly determine that Broadnax failed to make out a prima facie case for discrimination?**

The district court said: "Yes"
Broadnax says: "No"
Rhombus says: "Yes"


**II.   Did the district court properly dismiss Broadnax's hostile work environment claim?**

The district court said: "Yes"
Broadnax says: "No"
Rhombus says: "Yes"


**III.   Did the district court appropriately find that Broadnax's retaliation claim lacked the requisite causal connection between his alleged protected activity and his termination?**

The district court said: "Yes"
Broadnax says: "No"
Appellee says: "Yes"

## STATEMENT OF THE CASE

Darryl Broadnax was the Production Manager at a Dearborn, Michigan production facility operated by Rhombus Energy Solutions, Inc. until Rhombus fired him following numerous complaints about his management style and disregard for Rhombus's express instructions. Broadnax ignores his role in his termination and instead claims he was fired because he's a black Muslim. His Complaint seeks relief under Title VII for race discrimination (Count I) and under Michigan's Elliott-Larsen Civil Rights Act (ELCRA) for various forms of race and religious discrimination (Counts II-III, V-VI), as well as retaliation (Count IV).

Although Broadnax's resume boasted more than 20 years of production management experience at places like TRW Automotive and American Axle and a college education, Broadnax admitted under oath that his resume was false. He never worked at TRW or American Axle, his tenure with other companies was short and ended in his involuntary termination, and he doesn't have a college degree. Broadnax's own words are dispositive: he acknowledged that he falsified his resume was because he knew that without doing so, he wouldn't get the job. This was Rhombus's primary argument on summary judgment: Broadnax could not make out a prima facie case for discrimination because he didn't qualify for the Production Manager position. (Motion, R. 20, PageID.386-388). Rhombus also argued that it fired Broadnax for the legitimate, non-pretextual business reason that

3

Broadnax's behavior was disruptive and a threat to the company – the volume and nature of incidents in which he was involved was causing other employees to consider leaving. (*Id.*, PageID.388-392).

The district court agreed with Rhombus. It found that Broadnax had not "demonstrated that he possesses the minimum requirements of the Production Manager position, as set forth in the job description: at least five years of experience and a college degree." (Opinion, R. 26, PageID.594). The district court also held that Broadnax failed to establish pretext because he provided no evidence that Rhombus's stated reasons for Broadnax's termination "were fabricated or that Rhombus did not honestly believe them." (*Id.*, PageID.596). The district court also determined that Broadnax's retaliation claim failed because there was a gap between his last complaint of discrimination to Rhombus and his termination, in which there were several intervening, terminable events. (*Id.*, PageID.600). And the district court determined that to the extent that Broadnax could prove offensive conduct attributable to Rhombus, it didn't rise to the level of severe and pervasive, which is required to support a hostile work environment claim. (*Id.*, PageID.602).

For these reasons, the district court granted summary judgment in Rhombus's favor and dismissed Broadnax's Complaint in its entirety. (*Id.*, PageID.602; Judgment, R. 27, PageID.604).

## SUMMARY OF THE ARGUMENT

The key questions are: (1) whether Broadnax was qualified for Rhombus's Production Manager position, an element of his prima facie case for discrimination under both federal and Michigan state law; and (2) whether Broadnax can prove that Rhombus's stated reasons for his termination are pretextual. These questions are typically fact intensive, but the district court properly resolved them on summary judgment because Broadnax failed to meet his burden of proof on both issues. And he has not corrected these failures on appeal.

Instead of arguing that he was qualified for the Production Manager position, Broadnax cries foul over the district court's consideration of his falsified resume during the prima facie analysis. The falsified resume, though a blemish on Broadnax's character and credibility, isn't the point. The point is that, by Broadnax's own admission, he lacks the minimum education and experience required for the job. Because Broadnax is not qualified for the Production Manager position, he is unable to make out a prima facie case for discrimination and the district court properly dismissed his discrimination claims.

Even if the district court's conclusion in this regard was somehow erroneous, dismissing Broadnax's discrimination claims was warranted because Rhombus showed that it fired Broadnax for non-pretextual reasons and Broadnax failed to offer evidence to the contrary. Instead, Broadnax's arguments in the

5

district court were based on red herrings rooted in demonstrably incorrect recitations of the factual record and inadmissible evidence, which he repeats again on appeal. The district court aptly sorted fact from fiction and landed in just the right place.

The district court's dismissal of Broadnax's hostile work environment claim (Count III) was also correct. The district court dismissed it on different grounds than those argued by Rhombus following a proper invocation of Fed. R. Civ. Pro. 56(f)(2) and (3). Broadnax had notice that this claim was subject to dismissal and he has not proven or even argued prejudice. In fact, the record shows that the district court had all of the facts before it necessary to dismiss this claim based upon facts presented in Broadnax's response to the summary judgment motion.

Finally, the district court's analysis of the retaliation claim (Count IV) was both legally and factually sound. In the eight days between Broadnax's last discrimination complaint and his termination, Broadnax had five intervening incidents, cutting off any causal connection between Broadnax's discrimination report and his termination. The arguments Broadnax makes to the contrary rest upon an incorrect interpretation of the facts.

On the whole, the district court's opinion on this robust but straightforward factual record was thoughtful, reasoned, and based on undisputed facts. It should be affirmed.

## STATEMENT OF FACTS

### A.    The Production Manager's minimum job requirements.

Broadnax worked as an at-will Production Manager in Rhombus's Dearborn, Michigan facility from April 25, 2022 until June 17, 2022. (Complaint, R.1, PageID.2, ¶7; Termination Letter, R.20-13, PageID.493). The written job description for this position required a minimum of five years of production management experience in a manufacturing environment and a "BSc/BA in Business Administration or relevant field is preferred." (Job Description, R. 20-14, PageID.495). Broadnax confirmed that he understood that the "job asked for an individual who possessed a college bachelor's degree." (Broadnax Dep., R.20-5, PageID.447).

The job was posted through a website (such as Indeed.com), and the resume Broadnax submitted to Rhombus through that website matches these qualifications. (*Id.*, PageID.441; Resume, R.20-6, PageID.464). Among other things, the resume lists TRW Automotive, American Axle, and Dietrich Metal Stamping as prior long-time employers for whom Broadnax had allegedly worked since 1989 without interruption. (Broadnax Dep., R.20-5, PageID.443; Resume, R.20-6, PageID.464). According to the resume, Broadnax worked as a production manager at TRW for more than 20 years, where he "supervised 55 UAW employees," "conducted annual employee reviews," "adjusted staffing and team assignments to achieve

7

quality control targets and optimal flow efficiency," "guided staff," and "developed staff "through job coaching, training metrics, and ergonomic procedures." (Resume, R.20-6, PageID.464). Rhombus's then-Director of Operations, Scott Stromenger, testified that: "His resume looked very good. When he first came in to interview, he seemed to speak well about his prior jobs and things that he could do. So I felt strongly that he would be a good candidate for the job." (Stromenger Dep., R.20-2, PageID.412).

**B.    Broadnax did not have the minimal experience or education required for the job.**

Rhombus learned in discovery that Broadnax actually does not have the requisite work experience or education that the Production Manager position requires. Broadnax admitted that he never worked at TRW or at any of the other places listed on his resume. (Broadnax Dep., R.20-5, PageID.443, 447).

Indeed, Broadnax has had very little, if any, consistent experience in a production environment because he's been fired from nearly every production job he's had. He was an Operations Supervisor at ThyssenKrupp, but he was fired after only a couple of months for being too aggressive with employees. (*Id.*, PageID.448-449). He was a Production Supervisor at Hollingsworth, but after a month he was terminated because he mouthed off to the Production Manager, telling her that "she couldn't tell me what I could do on my break and what I couldn't do on my break." (*Id.*, PageID.445). Faurecia terminated Broadnax from a

8

Production Supervisor position that he held for only a month because Broadnax put an employee in "a headlock," and "slammed him on the floor," resulting in a police response. (*Id.*, PageID.445). Broadnax has also been terminated from a Production Supervisor position at Ford Motor Company and a Maintenance Supervisor position at Textron.  (*Id.*, PageID.444).

While Broadnax has tried to claim that Mr. Stromenger knew that he did not previously work at TRW (which Mr. Stromenger denies), it is undisputed that the resume Broadnax submitted to Rhombus to get the job interview was untrue:

> …when you applied on Indeed for the job with Rhombus, did that application say that you had worked at TRW?
>
> A Yes.
>
> Q Okay. Why did you submit a job application to Rhombus indicating that you had worked at TRW when you hadn't?
> [Plaintiff's counsel's objection.]
>
> THE WITNESS: That's a good question. Basically, I wanted the job. And I didn't want to put down the jobs that I had been terminated from or had some type of a situation.

(*Id.*, PageID.447 (emphasis added)).

Broadnax also fudged his education. Despite the resume's representation that he has both bachelor's and associate's degrees, Broadnax admitted that he never graduated from college, but included college degrees on his resume to "make my resume look good so I can get the job." (*Id.*, PageID.447-448).

### C.    Broadnax was terminated for poor behavior, performance, and policy violations.

Rhombus fired Broadnax as a result of numerous complaints and incidents that occurred during his short nine-week tenure with the company. (Incident Chart, R.20-10, PageID.483-484; Termination Letter, R.20-13, PageID.493). One of the first complaints Rhombus received was from a female employee who reported to Human Resources Manager, Courtney Davis, who is herself black, that Broadnax treated her differently than he treated other employees. (Deposition of C. Davis, R.20-3, PageID.422). Broadnax wrote up a different female employee twice for talking and dancing on the production floor, even though her direct supervisor didn't support at least one of the write-ups. (Davis Dep., R.20-3, PageID.422; Incident Chart, R.20-10, PageID.483-484). And Broadnax ordered around employees who didn't report to him. (Davis Dep., R.20-3, PageID.422; Incident Chart, R.20-10, PageID.483-484). In all, Rhombus wrote up *15 instances* of incidents, complaints, and disciplinary action against Broadnax in a chart that Rhombus produced on September 5, 2023 pursuant to Fed. R. Civ. Pro. 26(1) and which was downloaded by Broadnax's counsel that same day. (Incident Chart, R.20-10, PageID.483-484; Production email, R.24-5, PageID.570-571).

According to Ms. Davis, Broadnax also fabricated claims of discrimination by other employees. One such instance involved Warehouse Manager Russ Pulter, who used the word "colored," which Broadnax found offensive:

10

… this is how the conversation was going in passing. So I stopped to listen. That he [Mr. Pulter] didn't feel that he was a racist, or that he treated people any – in any indifferent way than he treated everybody. He said, because his high school that he went to had colored people, also.

(Broadnax Dep., R.20-5, PageID.457 (emphasis added)).

As Broadnax's testimony makes clear, this remark was "in passing," general in nature, and in the context of a story Mr. Pulter was telling about his time in high school. (*Id.*, PageID.457-458). Ms. Davis confirmed that she conducted an investigation into Broadnax's complaint about this incident, which revealed that due to the context in which Mr. Pulter's comment was made, it could not have been directed at Broadnax:

Russ was telling a story about him in high school and referred to African Americans as 'colored.'

*        *        *

… he was telling the story, how he went to work at -- High School, and how there were, you know, different doorways. And there were like, doorways for the colored folks and then there were doorways for the whites.

(Davis Dep., R.20-3, PageID.421-422).

This is the only time Ms. Davis is aware of that Mr. Pulter used this language. (*Id.*, PageID.422). But she testified that Broadnax made other non-specific complaints about Mr. Pulter:

… everything was like, you know, 'He is racist or discriminating.'

11

\*    \*    \*

Q And for these other complaints that Mr. Broadnax brought against Russell Pulter, saying that he was racist or using insensitive terminology, did you investigate those complaints as well?

A Yeah. So it wasn't -- it wasn't, like, 'He said this exactly.' Or, 'He said -- he said something in regards --' It wasn't something that was named like as the 'colored' comment. It was, you know, 'People feel like he'd been -- people felt that Russ was being racist.' And at that time Darryl gave me like a list of names, and I spoke with each and every employee to see, you know, if they felt that way as well.

Q Do you remember any of the names of those employees?

A Yes. It was Robert Cross. It was Jasmine [ph] -- I forgot her last name. But Jasmine. It was Anisa [ph] Williams. That's the three that are -- that are on, like, and I remember for sure.

\*    \*    \*

Q And did they give you any information that supported Mr. Broadnax's complaint?

A No.

(*Id.*, PageID.422).

One of the employees who Broadnax asserted would substantiate his allegations is Anissa Williams. Ms. Davis interviewed Ms. Williams, but Ms. Williams did not substantiate Broadnax's allegations – she had not heard Mr. Pulter say anything racist and she didn't observe behavior from him that she would characterize as racist. (Williams Affidavit, R.20-11, PageID.486 at ¶7). According to Ms. Davis, the other employees who Broadnax claimed would support his

12

allegations also did not substantiate them and, for this reason, Ms. Davis deemed Broadnax's complaint of racial discrimination by Mr. Pulter a fabrication and not in good faith. (Davis Dep., R.20-3, PageID.426).

Broadnax also disciplined an employee without involving Human Resources, resulting in a write-up and explicit instructions not to counsel or discipline employees by himself. The Disciplinary/Counseling Form, prepared by Ms. Davis, states in pertinent part that:

> On June 9, 2022 it was brought to my attention that apparently Mr. Broadnax wrote up Mr. Smith and a lot of insults was given by both Mr. Broadnax and Mr. Smith during the counseling. When I discovered this information, <u>I informed Mr. Broadnax that I or someone from the HR team must be present for all terminations and counseling, Mr. Broadnax understood.</u> On June 10, 2022 Mr. Broadnax sent me an email stating that he needed some assistance with counseling a few employees because of their performance, Mr. Smith was on that list…. On Friday June 10th, Mr. Broadnax stopped by my office before he left for the day, and I restated to him again that we all can meet as a team to address employees who he feels are having performance issues. <u>When I arrived to work on Monday June 13, 2022 it was brought to my attention that Mr. Broadnax had terminated Mr. Smith, even though he was directed to hold off on one on ones until he spoke with his Manager and Human Resource[s].</u>

(Disciplinary/Counseling Form, R.20-12, PageID.489-490) (emphasis added).

Even after this incident, Rhombus *still* did not fire Broadnax. It was not until Broadnax had one more altercation with a female employee, this time over Broadnax's perception that the employee violated the company's dress code, that Rhombus decided that Broadnax was simply incapable of managing and leading

13

employees effectively. Mr. Stromenger explained: "He went way over the top. I mean, he was -- the way he handled it, the way he was telling this individual that she had to leave and go change and threatening to write her up, it just -- again, it didn't follow policy." (Stromenger Dep., R.20-2, PageID.411). According to Mr. Stromenger, Broadnax's behavior was so problematic that his continued employment presented risk to the business:

> Well, I mean, it got to the point where I was literally having a mutiny out on the production floor. We were going to lose several key employees who -- I was going to lose several key employees due to his harassment and the way that he talked to people out on the floor. So my longstanding best employees were about to walk out, leave and go get a different job because they didn't like the work environment.

(Stromenger Dep., R.20-2, PageID. 409).

Due to these numerous issues, Broadnax was terminated on June 17, 2022. (Termination Letter, R.20-13, PageID.493).

### D.    <u>Proceedings below.</u>

Broadnax asserts that he was terminated as a result of race and religious discrimination and filed a six-count Complaint, alleging religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* (Count I); religious discrimination under ELCRA (Count II); hostile work environment under ELCRA (Count III); retaliation under ELCRA (Count IV); race discrimination and harassment under ELCRA (Count V); and race discrimination/disparate impact under ELCRA (Count VI). (Complaint, R.1, PageID.8-19).

14

Rhombus filed a motion for summary judgment, seeking dismissal of the discrimination claims, which Rhombus defined as Counts I-III and V-VI, primarily on the basis that Broadnax's lack of the required education and experience for the Production Manager position rendered him unqualified and unable to make out a prima facie case for discrimination. (Motion, R. 20, PageID.386-388). Even if Broadnax could meet this initial burden of proof, Rhombus argued that Broadnax could not rebut its evidence that it terminated Broadnax for a legitimate, non-discriminatory reason, i.e., that Broadnax was performing poorly and threatened to drive other employees away. (*Id.*, PageID.388-392). Rhombus also sought to dismiss Broadnax's retaliation claim (Count IV) because Broadnax failed to prove that he was engaged in protected activity or that, even if he was, such engagement was a significant factor in his termination. (*Id.*, PageID.392-394).

The district court granted the motion and entered judgment in Rhombus's favor. (Opinion, R.26, PageID.602; Judgment, R. 27, PgeID.604). In so doing, the district court largely agreed with Rhombus's arguments regarding the discrimination claims, finding that Broadnax failed to meet his evidentiary burden as to his qualifications and pretext. (Opinion, PageID.594-599). The district court also found that even when viewing the evidence in the light most favorable to Broadnax, he failed to plead or prove that Rhombus's complained-of conduct – Mr. Pulter's use of the term "colored" and an employee allegedly calling Broadnax

15

the n-word – was anything other than offensive: "these incidents do not amount to severe and pervasive conduct that created an abusive working environment." (*Id.*, PageID.602). In dismissing the retaliation claim, the district court relied upon the fact that between Broadnax's complaint to Rhombus about Mr. Pulter's use of the term "colored" and his termination, Rhombus had "documented several instances when it was dissatisfied with [Broadnax's] performance, including his unauthorized termination of another employee." (*Id.*, PageID.600). Citing this Court's decision in *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013), for the proposition that "'[A]n intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based upon temporal proximity,'" the district court determined that because Broadnax provided no evidence other than timing that his alleged protected activity was a significant factor in his termination, his retaliation claim failed. (Opinion, R.26, PageID.600).

This appeal followed.

16

## ARGUMENT:
## THE DECISION GRANTING SUMMARY JUDGMENT
## SHOULD BE AFFIRMED

### I.    Standard of Review.

This Court reviews the decision granting summary judgment pursuant to Fed. R. Civ. Pro. 56 *de novo*. *Central States, Southeast and Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008). Under that rule, once the moving party presents evidence in the form of depositions, documents, or other materials showing the absence of a genuine issue of material fact, the non-moving party must make an affirmative showing that there is evidence upon which the jury could reasonably find in his favor. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "[S]elf-serving innuendo and speculation … does not suffice to survive summary judgment." *Sperber v. Nicholson*, 342 Fed. Appx. 131, 132 (6th Cir. 2009).

### II.    The district court correctly determined that Broadnax failed to make out a prima facie case for discrimination.

The district court properly dismissed Broadnax's discrimination claims (Counts I-III, V-VI) because other than "self-serving innuendo and speculation," *id.*, Broadnax presented no evidence to prove a necessary element of his prima facie case – that he was qualified for the job. And even if he had made out a prima facie case, Broadnax offered no evidence that Rhombus's reasons for terminating him were pretextual. Broadnax's opening brief has offered nothing to justify

17

disturbing this decision.

The district court's starting point was to correctly observe that because Broadnax did not present direct evidence of discrimination, his claims under both Title VII and the ELCRA were subject to the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). (Opinion, R.26, PageID.593). Numerous cases from this Circuit have set forth the four elements that a plaintiff must meet under this framework to meet his "not onerous" burden of making out a prima facie case, one of which is that the plaintiff was qualified for the job. *E.g.*, *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606-607 (6th Cir. 2019); *Alexander v. CareSource*, 576 F.3d 551, 563 (6th Cir. 2009); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) ("At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job.").

If the plaintiff does not meet this burden, the court need not go further. *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004) ("[B]ecause Appellant did not establish a prima facie case, this Court need not address the issue of pretext."). Only if the plaintiff does meet this burden will the burden then shift to the defendant to provide a legitimate, nondiscriminatory reason for the plaintiff's termination and, if the defendant does so, the burden shifts back to the plaintiff to produce evidence that the stated reason is a pretext for discrimination. *Id.* at 906.

18

**A.** **Broadnax failed to produce evidence or even argue that he was qualified for the Production Manager position.**

The facts are undisputed that Broadnax did not meet the minimum requirements for the Production Manager position. It required five years of production management experience, which Broadnax admits he didn't have. (Broadnax Dep., R.20-5, PageID.443, 447-449). Broadnax also didn't have the requisite education – he lacked a college degree. (*Id.*, PageID.447-448). Because Broadnax's objective qualifications don't match the Production Manager position's minimum experience and education requirements, he cannot meet one of the four elements of his prima facie case, defeating his discrimination claims.

Broadnax's arguments in avoidance of this conclusion are without merit. First, citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-664 (6th Cir. 2000), Broadnax claims that "consideration of qualifications is not part of the prima facie analysis under *McDonnell Douglas*" and that qualifications are "to be considered only during the pretext analysis when assessing the legitimacy of the defendant's nondiscriminatory reason for its adverse action." (ECF No. 23-1, pg. 16). This is an incorrect analysis of *Cline*.

The problem in *Cline* was the district court's conflation of the plaintiff's burden to prove job qualification with the pretext analysis. The employer had terminated the plaintiff because she became pregnant through premarital sex, in violation of the employer's moral code. The employer argued, and the district court

19

agreed, that the moral code violation rendered the plaintiff unqualified, despite strong evidence that the plaintiff met the position's experience and education requirements. However, the district court's analysis "improperly precluded Cline from being able to challenge the policy she claims to be discriminatory." 206 F.3d at 660. This Court explained that a court must examine a plaintiff's evidence of job qualification "independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff," and the district court "clearly failed to do this, improperly conflating the distinct stages of the *McDonnell Douglas* inquiry." *Id.* at 660-661.

The district court didn't make this mistake here. While it is true that Broadnax's lack of qualifications is a likely explanation for his poor performance, the district court did not conflate the qualification issue with the pretext analysis. Rather, the district court simply determined that Broadnax failed to meet the objective criteria required of the Production Manager job. (Opinion, R. 26, PageID.594-595). The district court mentioned nothing about Broadnax's failures to properly perform his duties in its prima facie analysis, but addressed that issue separately, when analyzing whether Rhombus's stated reasons for terminating Broadnax's employment were pretextual. (*Id.*, PageID.595-599). Broadnax's attempt to use *Cline* to claim error by the district court fails.

Broadnax's alternative argument, that Rhombus's Scott Stromenger knew

that Broadnax never worked at TRW is factually inaccurate. Broadnax's testimony confirms that the resume he submitted to Rhombus through Indeed.com – before Broadnax ever met Mr. Stromenger – was falsified, and that by the time he was talking to Mr. Stromenger about his employment history, he "already had [TRW] on there." (Broadnax Dep., R.24-3, PageID.565). And the contents of Broadnax's resume at the time he first submitted it to Rhombus through Indeed.com were untrue: "[W]hen you applied on Indeed for the job with Rhombus, did that application say that you had worked at TRW? A. <u>Yes</u>." (*Id.*, PageID. 447 (emphasis added)).

Even if Mr. Stromenger did know Broadnax's actual employment history, such knowledge is irrelevant. *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1251 (7th Cir. 1990). Broadnax's opening brief cites no law supporting a position to the contrary. Because Broadnax failed to produce evidence that he was qualified for the Production Manager position, Broadnax's discrimination claims (Counts I-III, V-VI) fail as a matter of law and this Court need not go any further. *Humenny*, 390 F.3d at 907

**B.    <u>Broadnax failed to produce evidence that the company's stated reason for Broadnax's termination was pretextual.</u>**

Rhombus's proffered legitimate, nondiscriminatory reason for terminating Broadnax is his poor performance. The evidentiary record in this regard is rich, finding support in the testimony of Rhombus's representatives, a document

maintained by Rhombus's Human Resources chronicling complaints against Broadnax (R.20-10, PageID.483-484), a disciplinary/counseling form (R.20-12, PageID.489-491), and the termination letter. (R. 20-13, PageID.493).

With Rhombus having met its burden, Broadnax's duty was to produce evidence that the stated reason was pretextual, which requires a showing that "the proffered reason (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 678-679 (6th Cir. 2008). The district court found that Broadnax failed to meet this burden, and Broadnax has offered nothing on appeal showing that such decision was wrong.

Broadnax starts with the same error he accuses the district court of making – he conflates the issue of his qualifications with the showing that Rhombus is to make under the pretext analysis, stating that Broadnax's "alleged lack of qualifications, Defendant argues, means that by default Plaintiff could not have performed the job to Defendant's satisfaction." (ECF No. 20, pg. 19). But this was not the basis for the district court's decision. Again, Broadnax lacked the objective, minimum education and work experience qualifications that the job required, and even if he could prove that he was qualified, he failed to produce evidence of each element required for pretext. (Opinion, R.26, PageID.594-595).

Broadnax then proceeds to either torture the factual record or misapply the

law to the facts. First, Broadnax points (vaguely) to "racially insensitive language" to ascribe discriminatory intent to Rhombus, which appears to refer to Warehouse Manager Russ Pulter's use of the word "colored." As Broadnax's opening brief states, this was not directed at Broadnax – he merely "heard" it. (ECF No. 20, pg. 20). (*See also* Broadnax Dep., R.20-5, PageID.457-458 (confirming that this remark was "in passing")). Mr. Pulter's comment is a stray remark, made by someone with no input in termination decisions, and not directed at Broadnax. *Suits v. The Heil Co.*, 192 Fed. App'x 399, 407 (6th Cir. 2006) ("stray remarks, particularly those made by a person other than a decision-maker, are not enough to show discrimination.").

Second, Broadnax attempts to distinguish *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) and a case cited by Rhombus in its dispositive motion, but not cited in the district court's decision, *Thomas v. Autumn Woods Residential Health Care Facility*, 905 F. Supp. 414 (E.D. Mich. 1995), on the basis that he "did not have numerous written disciplines, counseling, or negative performance reviews." (ECF No. 20, pg. 20). This is demonstrably untrue, as the now infamous "Exhibit I" to Rhombus's dispositive motion lists *15 instances* of discipline, counseling, or negative performance reviews over a nine-week period. (R.20-10, PageID.483-484).

Contrary to Broadnax's assertions, this document is admissible because it is

a business record made and kept in the ordinary course of business by a person with knowledge of its contents. *See Cobbins v. Tenn. Dept. of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). Rhombus's Courtney Davis referred to this document during her deposition. (Davis Dep., R.24-6, PageID.576). So, the document was obviously produced during discovery and was created in the ordinary course of Ms. Davis's role as Human Resources Manager, making it admissible not only under Fed. R. Evid. 803(6) but also worthy of consideration during the summary judgment phase because it "will be reduced to admissible form at trial." *DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911-912 (E.D. Mich. 2008). Broadnax's assertion that "the only discipline" attached to Rhombus's dispositive motion is the one involving the Brian Smith incident is incorrect.[1]

Also incorrect is Broadnax's recitation of the timeline concerning the Brian Smith incident and Broadnax's termination. The Brian Smith incident occurred on June 13, 2022. (Disciplinary/Counseling Form, R.20-12, PageID.489). Broadnax's Complaint says he was terminated on June 22. (R.1, PageID.8, ¶ 52). The termination letter says he was terminated on June 17. (R.20-13, PageID.493). The incident came first, and termination second – either four or nine days later.

Broadnax's contention that he was terminated on June 10, 2022 comes from

---

[1] Broadnax's argument that he was not asked about the Brian Smith incident during his deposition is also wrong – he was asked about it and testified about it at length. (Broadnax Dep., R.20-5, PageID.453-454).

his deposition: "On Monday, June 10th I was terminated." (Broadnax Dep., R.20-5, PageID.440). But this does not create a *genuine* factual dispute because it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380-381 (2007) (citations and quotations omitted). Under such a circumstance, the district court properly disregarded Broadnax's version of the facts, *id.*, and this Court should do the same. Indeed, one need look no further than a calendar to see that Broadnax's testimony is simply wrong. This Court can take judicial notice under either Fed. R. Evid. 201(b)(2) or (c)(2) of the fact that in 2022, June 10th was a Friday, not a Monday:



*See Thoma v. Warden, Pickaway Corr. Inst.*, Case No. 1:20-cv-282, 2020 WL 6318213, at *4 n.1 (S.D. Ohio, Oct. 28, 2020) (Exhibit A) (taking judicial notice that "Easter in 2016 was March 27 in the Roman calendar which is typically followed in the United States").

25

And then there is the Takelia Stephens affidavit, which is riddled with hearsay. "Hearsay testimony alone cannot defeat a motion for summary judgment." *Trustees of Mich. Laborers; Dist. Council Pension Fund v. Van Sullen Const., Inc.*, 825 F. Supp. 165, 170 (E.D. Mich. 1993). Nearly every paragraph of the affidavit contains statements such as "I talked to …", "I became aware …", and "He told us …." (Stephens Affidavit, R.23-1, Page ID.540-542). Thus, the district court could have simply disregarded the affidavit.

However, the district court actually did consider it, but found that neither the affidavit nor any of the other facts relied upon by Broadnax supported Broadnax's claim of pretext. The district court cited a number of cases supporting its conclusion that Broadnax's claim that Rhombus's version of events is wrong, without evidence showing that Rhombus's stated reasons for the termination didn't happen, didn't motivate the termination, or were insufficient to motivate the termination, isn't enough to overcome summary judgment. (Opinion, R. 26, PageID.596-597 (citing cases). As this Court in one of those cases put it: "To carry [his] burden in opposing summary judgment, [Broadnax] must produce sufficient evidence from which a jury could reasonably reject [Rhombus's] explanation of why it fired [him]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). In *Chen*, as in this case, the employer had particularized facts supporting its termination decision, including coworkers' complaints, documented performance

problems, and workplace conflicts. *Id.* at 401.

To the extent that the affidavit contains non-hearsay statements, it either make conclusions without a factual basis (claiming Rhombus "Fired Darryl because he was Black" (Stephens Affidavit, R.23-1, PageID.542), gives opinions ("I thought it was wrong and unfair," *id.*, PageID.543), or offers irrelevant observations that the affiant is not in a position to offer. Whatever criticisms Ms. Stephens (or Broadnax) has of Rhombus's handling of the obviously difficult situation the company was in during Broadnax's tenure, there is no evidence that Rhombus's decision to fire Broadnax was not reasonably informed or based upon an honest belief that Broadnax's behavior had risen to the level of terminable. *See Davis v. City of Clarksville*, 492 Fed. App'x 572, 581 (6th Cir. 2012) (explaining that an employer's "investigation need not be perfect so long as the decision was 'a reasonably informed and considered' one.") (citations omitted). As Mr. Stromenger explained, without terminating Broadnax, the business was at risk of losing long-time, valued employees.   (Stromenger Dep., R.20-2, PageID.409). Neither Ms. Stephens nor this Court is in a position to substitute its business judgment for Rhombus's. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.").

The fact is that Rhombus made the decision that it felt was best based on its

investigation and assessment of the situation at hand and concluded that the business would suffer if Broadnax remained employed. There was no evidence of discriminatory intent in the court below and Broadnax's opening brief adds nothing new. The district court's decision should be affirmed.

### C.    The district court properly dismissed Broadnax's hostile work environment claim.

Broadnax incorrectly asserts that "Defendant did not move" for Count III's dismissal. The wherefore clause in Rhombus's dispositive motion sought dismissal of "Plaintiff's Complaint in its entirety." (R.20, PageID.365). And Rhombus's motion defined the discrimination claims to include Count III, and repeatedly argued for its dismissal along with the other four discrimination claims. (R.20, PageID.363, 365, 369, 385, and 388). The district court's decision was, therefore, consistent with Rhombus's requested relief, even if the basis for the district court's decision was different than the grounds upon which Rhombus sought such relief.

In this way, the district court appropriately invoked Fed. R. Civ. Pro. 56(f)(2) and (3), which allows for summary judgment on grounds not raised by a party or on the trial court's own initiative "after identifying for the parties material facts that may not be genuinely in dispute." The test is two-pronged: "losing parties must demonstrate both that they lacked sufficient notice of the district court's action and that they suffered prejudice as a result." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (internal citations and quotations

28

omitted). Broadnax argued neither element, and he cannot credibly do so.

With respect to notice, courts have looked to a variety of factors, including what claims the prevailing party's motion purported to address and the facts included in each party's briefs. *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 Fed. App'x 953, 960 (6th Cir. 2007). Where a prevailing party asks for all claims to be dismissed and implies that a particular claim lacks merit even without addressing it directly, a losing party had notice. *Id.* at 961 (explaining that the defendants "summarily asked that their motion for summary judgment 'should be granted," and "implying that Plaintiff's breach of contract claim lacked merit."). Such is the case here. Rhombus's dispositive motion was clear that it sought dismissal of each of Broadnax's six causes of action and defined those claims to include Count III.

What is more, to address counts other than hostile work environment, both parties extensively briefed the facts regarding Broadnax's work life at Rhombus, including the incidents in which Broadnax was involved and Rhombus's handling of them. Such facts relate both to the pretext analysis, as well as to the fourth element of a hostile work environment claim – whether alleged harassment affected a term, condition, or privilege of employment – upon which the district court's decision was based. (Opinion, R.26, PageID.601). Indeed, the facts that the district court relied upon when analyzing the hostile work environment claim came from Broadnax's brief: "He (Broadnax) refers to incidents when [Warehouse

Manager] Pulter used the term 'colored' to refer to African Americans and when 'Ken' called him the n-word." (*Id.*, Page ID.602). Broadnax was obviously aware of the facts that supported the district court's grant of summary judgment in Rhombus's favor, and as such, the burden fell to Broadnax to create a genuine issue of material fact for trial. *Turcar, LLC v. I.R.S.*, 451 Fed. App'x. 509, 515 (6th Cir. 2011). Broadnax failed to meet this burden.

As to prejudice, it requires proof that the district court's summary judgment decision deprived Broadnax of his ability to develop the record or to present legal arguments that would undermine Rhombus's entitlement to judgment as a matter of law. *Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.,* 212 Fed. App'x. 558, 567 (6th Cir. 2007). Broadnax had multiple opportunities to develop the record in his favor *and he did so* by including facts in his response brief upon which the district court relied to dismiss the hostile work environment claim. If Broadnax felt that the district court improperly granted summary judgment of Count III, he could have sought reconsideration, which he did not do. And Broadnax has not attempted to supplement the record on appeal – a tacit admission that the district court had all of the facts before it.

On those facts, the district court found no genuine issue of material fact that the incidents relied upon by Broadnax "do not amount to severe and pervasive conduct that created an abusive working environment." (R.26, PageID.602). This

substantive determination finds ample support in this Circuit, which has "established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory" and long held that "even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). *See also Williams v. CSX Transp. Co.*, 643 F.3d 502, 506 (6th Cir. 2011) (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came from."); *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. App'x. 421, 432 (6th Cir. 2014) (finding no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707-708 (6th Cir. 2007) (finding no hostile work environment despite 15 racially-motivated comments).

The case Broadnax cites for a contrary result, *Yashon v. Gregory,* 737 F.2d 547 (6th Cir. 1984), is factually distinguishable because the trial court there entered summary judgment without the defendant having filed any motion. The case had been remanded to the district court on a due process issue and the district court entered an order directing briefing on the remanded issue. The order didn't indicate that summary judgment was being considered, and the plaintiff sought

twice to supplement the evidentiary record and once for a continuance, expressly noting that "the defendants had not filed a motion for summary judgment, but if the court were construing the procedural posture of the case as presenting a question for determination under Rule 56, then a continuance was necessary." *Id.* at 549. The district court didn't decide any of the plaintiff's motions but granted summary judgment instead. Unremarkably, this Court reversed on the basis that: "not having an opportunity to respond constitutes prejudice." *Id.* at 552.

This case is obviously very different. Broadnax knew precisely what was at stake, and he briefed all issues accordingly. The district court appropriately considered Broadnax's facts and concluded that when viewing such facts in the light most favorable to him, the hostile work environment lacked factual support. This is the quintessential example of a case in which "remanding the case to the district court would merely entail an empty formality with no appreciable possibility of altering the judgment." *Excel Energy*, 246 Fed. App'x at 960. There was no error and the district court's dismissal of the hostile work environment claim should be affirmed.

## III. The district court appropriately found that Broadnax's retaliation claim lacked the requisite causal connection between his alleged protected <u>activity and his termination.</u>

In Count IV of his Complaint, Broadnax alleges he was fired for making complaints about discrimination. To establish a retaliatory discharge claim,

Broadnax must demonstrate that he was engaged in protected activity, which "was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007).

The timeline is important to this analysis, and the district court got it right: the first incident in which Broadnax complained about Mr. Pulter's use of insensitive language (the one involving use of the word "colored") happened on May 19, 2022, and the second one (involving religion) happened on June 9, 2022. (Incident Chart, R.20-10, PageID.483). Broadnax was terminated after that, either on June 17, 2022 or June 22, 2022. (Termination Letter, R.20-13, PageID. 493; Complaint, R.1, PageID.8, ¶52). In that period of time, Broadnax was involved in five incidents: the first and second Brian Smith incident (June 9 and 13), heavy-handed discipline of an employee dancing on the shop floor (June 10), taking credit for another's work (June 15), and the issue regarding the alleged dress code violation (June 16). (Incident Chart, R. 20-10, PageID.483-484).

Such intervening events are fatal to a retaliation claim: "'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013). For these reasons, the district court held that Broadnax was unable to make out a prima facie claim of retaliation because, other than the

timing, Broadnax had provided "no evidence that his protected activity was the 'likely reason' for his termination." (Opinion, R.26, PageID.600).

Broadnax fails to address this issue at all. He instead attacks the credibility of Rhombus's evidence, including the chart chronicling Broadnax's behavior, and the wisdom of Rhombus's investigations of Broadnax's complaints. As is the theme of Broadnax's brief, he has not shown that the district court erred. The retaliation claim fails, and the district court dismissed it for good reason.

## **CONCLUSION**

At bottom, the allegations in Broadnax's Complaint lacked factual support. Other than speculation and attorney argument, Broadnax did not meet his burden to overcome summary judgment under Fed. R. Civ. Pro. 56. The district court correctly recognized this and acted accordingly. Its decision granting Rhombus's motion for summary judgment should be affirmed.

GIARMARCO, MULLINS & HORTON, PC

By: /s/Elizabeth A. Favaro
    Elizabeth A. Favaro (P69610)
    Attorney for Defendant/Appellee Rhombus
    Tenth Floor Columbia Center
    101 West Big Beaver Road
    Troy, Michigan 48084-5280
    Phone: (248) 457-7000
    E-Mail:  efavaro@gmhlaw.com

Date:  June 18, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) in that it contains no more than 13,000 words, and that the typeface and type style requirements of 14 point Times New Roman pursuant to Fed. R. App. P. 32(a)(5) and 32(a)(6) have been complied with.  In certifying the number of words in the brief I have relied on the word count of the word-processing system used to prepare the brief.

/s/Elizabeth A. Favaro
Elizabeth A. Favaro
Attorney for Defendant/Appellee Rhombus

## CERTIFICATE OF SERVICE

On June 18, 2025, I certify that I electronically filed this document with the Clerk of the Court through the CM/ECF System, which will send notice of such electronic filing to all counsel of record.  I certify that all participants in the case are registered electronically and are CM/ECF System users, and service will be effected by the CM/ECF System.

GIARMARCO, MULLINS & HORTON, PC

By: /s/Elizabeth A. Favaro
    Elizabeth A. Favaro (P69610)
    Attorney for Defendant/Appellee Rhombus
    Tenth Floor Columbia Center
    101 West Big Beaver Road
    Troy, Michigan 48084-5280
    Phone: (248) 457-7000
    E-Mail:  efavaro@gmhlaw.com

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| RECORD | DESCRIPTION | PAGE ID |
|--------|-------------|---------|
| 1 | Complaint | 2, 8-19 |
| 20 | Defendant's Corrected Motion for Summary Judgment | 363, 365, 369, 385-395 |
| 20-2 | Exhibit A to Defendant's Corrected Motion for Summary Judgment | 404, 409-412 |
| 20-3 | Exhibit B to Defendant's Corrected Motion for Summary Judgment | 420-422, 426, 429-430 |
| 20-5 | Exhibit D to Defendant's Corrected Motion for Summary Judgment | 440-441, 443-445, 447-449, 453-454, 457-458 |
| 20-6 | Exhibit E to Defendant's Corrected Motion for Summary Judgment | 464 |
| 20-10 | Exhibit I to Defendant's Corrected Motion for Summary Judgment | 483-484 |
| 20-11 | Exhibit J to Defendant's Corrected Motion for Summary Judgment | 486 |
| 20-12 | Exhibit K to Defendant's Corrected Motion for Summary Judgment | 489-491 |
| 20-13 | Exhibit L to Defendant's Corrected Motion for Summary Judgment | 493 |
| 20-14 | Exhibit M to Defendant's Corrected Motion for Summary Judgment | 495 |
| 23-1 | Exhibit A to Plaintiff's Brief in Support for Plaintiff's Response to Defendant's Motion for Summary Judgment | 540-543 |
| 24 | Defendant's Reply in Support of Motion for Summary Judgment | 548 |
| 24-3 | Exhibit B to Defendant's Reply in Support of Motion for Summary Judgment | 565 |
| 24-5 | Exhibit D to Defendant's Reply in Support of | 570-571 |

| | | |
|---|---|---|
| | Motion for Summary Judgment | |
| 24-6 | Exhibit E to Defendant's Reply in Support of Motion for Summary Judgment | 576 |
| 26 | Opinion and Order Granting Defendant's Motion for Summary Judgment | 593-600, 602 |
| 27 | Judgment | 604 |
| 28 | Notice of Appeal | 605 |

# APPENDIX

## DESIGNATION OF EXHIBIT

Exhibit A          ***Thoma v. Warden, Pickaway Corr. Inst.*****, Case No. 1:20-cv-282, 2020 WL 6318213 (S.D. Ohio, Oct. 28, 2020)**

# EXHIBIT A

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

2020 WL 6318213
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division,
at Cincinnati.

Brian THOMA, Petitioner,

v.

WARDEN, PICKAWAY CORRECTIONAL
INSTITUTION, Respondent.

Case No. 1:20-cv-282
|
Signed 10/28/2020

**Attorneys and Law Firms**

Jennifer M. Kinsley, The Law Office of Jennifer Kinsley,
Cincinnati, OH, for Petitioner.

Daniel J. Benoit, Columbus, OH, for Respondent.

**REPORT AND RECOMMENDATIONS**

Michael R. Merz, United States Magistrate Judge

**\*1** This habeas corpus case, brought by Petitioner Thoma
with the assistance of counsel, is before the Court for decision
on the merits. Relevant filings are the Petition (ECF No. 1),
the State Court Record (ECF No. 9), the Return of Writ (ECF
No. 10), and Petitioner's Reply (ECF No. 15).

The Magistrate Judge reference in the case was recently
transferred to the undersigned to help balance the Magistrate
Judge workload in the District. Final decision of the case
remains with District Judge Black.

**Litigation History**

The March 2016 term of the Warren County Grand Jury
indicted Thoma on eight counts of sexual battery in violation
of Ohio Revised Code § 2907.03(A)(5) (Counts 1, 2, 4, 6, 8,
10, 12, & 14) and seven counts of gross sexual imposition in
violation of Ohio Revised Code § 2907.05(A)(5) (Counts 3,
5, 7, 9, 11, 13, & 15). (Indictment, State Court Record, ECF
No. 9, PageID 51-57.) The alleged victim on each count was
his fifteen-year-old adopted daughter, H.T. Thoma waived
his right to jury trial and the case was tried to the bench.
After he was convicted on all counts, the trial court merged
the sexual battery and gross sexual imposition charges and

sentenced Thoma to forty-two months on each count, to be
served consecutively for a total of 336 months.

Thoma appealed to the Ohio Twelfth District Court of
Appeals which affirmed the conviction, but remanded for
resentencing. *State v. B.J.T.,* 2017-Ohio-8797, 101 N.E.3d 62
(Ohio App. 12th Dist. Dec. 4, 2017), appellate jurisdiction
declined, 152 Ohio St. 3d 1464, 97 N.E.3d 501 (2018).
On remand he received the same sentence which was then
affirmed on appeal, *State v. B.J.T.,* 2018-Ohio-4720 (Ohio
App. 12the Dist. Nov. 26, 2018), appellate jurisdiction
declined, 2019-Ohio-944, 155 Ohio St.3d 1405, 119 N.E.3d
433 (2019).

On February 15, 2018, Thoma filed through counsel a
petition for post-conviction relief under Ohio Revised Code
§ 2953.21. The trial court denied relief (Order, State Court
Record, ECF No. 9, Ex. 30). The court of appeals again
affirmed. *State v. B.J.T.,* 2019-Ohio-1049 (12th Dist. Mar. 25,
2019), appellate jurisdiction declined, 2019-Ohio-2982, 140
N.E.3d 1069 (2019).

Thoma then filed the instant Petition, pleading the following
grounds for relief:

**Ground One:** Trial counsel committed ineffective
assistance of counsel at trial in violation of the Sixth
Amendment right to counsel.

**Supporting Facts:** Trial counsel failed to present
exculpatory witnesses and evidence in support of the
defense.

**Ground Two:** Trial counsel committed ineffective
assistance of counsel in plea bargaining in violation of the
Sixth Amendment right to counsel.

**Supporting Facts:** Trial counsel failed to effectively
negotiate in plea bargaining and to communicate with
Thoma about his plea options.

**Ground Three:** Thoma's sentence was disproportionate in
violation of the Eighth Amendment.

**Supporting Facts:** Thoma was sentenced
disproportionately to similarly situated offenders convicted
of similar crimes.

**Ground Four:** Thoma's convictions were against the
manifest weight of evidence and supported by insufficient
evidence in violation of the Fourteenth Amendment.

**Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)**

Case: 25-1171   Document: 24   Filed: 06/18/2025   Page: 48

2020 WL 6318213

**\*2  Supporting Facts:** Weighing evidence as a whole, there was insufficient evidence to support the required elements of penetration, sexual conduct, and sexual gratification.

(Petition, ECF No. 1.)

### Analysis

**Ground One: Ineffective Assistance of Counsel**

In his First Ground for Relief, Thoma claims he received ineffective assistance of trial counsel when his attorney did not present exculpatory witnesses. Respondent defends this Ground for Relief on the merits, asserting that the Twelfth District's rejection of the claim is entitled to deference (Return, ECF No. 10, PageID 867-71).

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. 2052. In other words, to establish ineffective assistance, a defendant must show both deficient

performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, 104 S.Ct. 2052.

As to the second prong, the Supreme Court held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. See also *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), citing *Strickland, supra.; Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), citing *Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), quoting *Harrington v. Richter*, 562 U.S. 86, 111-12, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).

**\*3**  In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland*, 466 U.S. at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.*, at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered

Case: 25-1171  Document: 24  Filed: 06/18/2025  Page: 49

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." Id., at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The likelihood of a different result must be substantial, not just conceivable. Id., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter,* 562 U.S. 86, 111-112, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).

**Uncalled Lay Witnesses**

In his Reply, in support of his First Ground for Relief, Thoma summarizes the evidence he believes should have been presented from a number of uncalled lay witnesses as follows:

> Numerous witnesses were available to testify on Thoma's behalf at trial to dispute the characterization of him as a violent person. See D. Thoma Aff. ¶ 8; Sue Thoma Aff. ¶ 13; J. Logan Aff. ¶ 8; M. Carrancejie Aff. ¶¶ 14-15 PAGEID 323-35. These witnesses frequently observed Thoma's interactions with H.T. and H.T.'s behavior around her father during the time he was supposedly digitally penetrating her on a weekly basis. According to the witnesses, Thoma was not violent, to the point of not fighting back when Wendy was physically aggressive towards him. See M. Carrancejie Aff. ¶ 10 PAGEID 332. In addition, H.T. had a close, warm, and loving relationship with her father and did not seem afraid of him in any way. See id. at ¶¶ 4, 5, 11; D. Thoma Aff. ¶¶ 5, 7; J. Logan Aff. ¶ 6 PAGEID 329-30, 331-2, 335.

> For example, shortly before Thoma was arrested, Thoma's sister Michelle Carrancejie and her family visited the Thoma[']s. See M. Carrancejie Aff. ¶ 3 PAGEID 331. During the trip, H.T. was laughing and cutting up with her dad, was sitting close by him, and asked for his help in learning to drive. Id. at ¶ 3 PAGEID 331. H.T. voluntarily went alone with Thoma in his vehicle to practice driving. Id. at ¶¶ 4-5 PAGEID 331.

> In addition, either one or two nights before Thoma was arrested, he and H.T. visited his Uncle Doug, who lived about 10 minutes away. See D. Thoma Aff. ¶¶ 4, 7 PAGEID 329-30. There were a lot of people in the living room, and Thoma was sitting on the couch with his legs slightly spread. Id. at ¶ 7 PAGEID 330. H.T. voluntarily sat on her dad's knee and put her arm around him. Id. The night before Thoma was arrested, H.T. told Thoma's friend what a great dad he is and how appreciative she was of him teaching her

how to drive. See J. Logan Aff. ¶¶ 3-4 PAGEID 334. And. H.T. reported that she was much more afraid of her mother than her father, and that no one was afraid of her father. See Sue Thoma Aff. ¶ 8 PAGEID 326. These are hardly the words and actions of a child who was afraid of her father or feared for her life.

> In addition, numerous family members were present in H.T.'s life from whom she could have asked for help. H.T. went driving alone with her grandmother, had an uncle who lived only 10 minutes away, and an aunt who visited while H.T. was allegedly being sexually abused. See id. at ¶¶ 3, 6; Sue Thoma Aff. ¶ 9; D. Thoma Aff. ¶ 4. PAGEID 323-35. Any of these adults would have helped her, but she said nothing and did not seek help.

> **\*4** In addition, numerous witnesses were available to testify that Wendy has a severe alcohol problem and frequently becomes intoxicated and angry. See Sue Thoma Aff. ¶ 5 PAGEID 326 (describing incident in which Wendy drank so much that she couldn't get up off the floor); J. Logan Aff. ¶ 7 PAGEID 335 (describing incident in which Wendy became drunk and verbally abusive); M. Carrancejie Aff. ¶¶ 7-9 PAGEID 332 (describing incident shortly before Thoma's arrest where Wendy was consuming heavy alcoholic drinks). Wendy also told Thoma's mother the day after he was arrested that she was going to "make this so much worse than it was" for Brian. *Id.* at ¶ 10 PAGEID 332. Had this testimony been presented at trial, it would have undercut Wendy's credibility and ability to report reliable observations and would also have demonstrated that she had a reason to encourage her daughter to exaggerate the allegations against Thoma. This testimony would have been particularly important, given that H.T. did not report allegations regarding a knife during her first extensive interview with police, but only later added a knife to her statement after her mother, who she was afraid of, took her on an expensive shopping trip.

(ECF No. 15, PageID 902-04).

The incidents in suit occurred from September 2015 to April of 2016; the trial occurred in October 2016. The testimony these witnesses were assertedly prepared to give at trial was offered to by way of affidavits attached to the post-conviction petition filed January 18, 2018, almost two years after the crimes. They are summarized as follows:

> **Affidavit of Petitioner:** I asked my attorney through my mother to get me a polygraph examination. The

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 50

2020 WL 6318213

attorney advised against it because the results would be inadmissible.

**Affidavit of Deborah "Sue" Thoma**, Petitioner's mother: Although H.T. is adopted, we always treated her as family. Wendy, Brian's spouse, has a serious alcohol problem. Sue lives in Florida but visits regularly. The last time she did so was on Easter before Brian was arrested. [1] During the trip she found H.T.'s relationship with Brian to be positive. When she returned to Ohio after Brian's arrest, Wendy did not want to see her.

**Affidavit of Doug Thoma, Brian's uncle:** He lived nearby and saw Brian and his family about twice a month. H.T.'s relationship with Brian was "very good, warm, and loving." Within forty-eight hours before Brian's arrest, he and his family were at Doug's home. During the visit, H.T. went and sat on her father's lap.

**Affidavit of Michelle Carrancejie, Brian's sister:** About a month before Brian's arrest, she, her family, and her mom came to Ohio to visit for nine days. [2] During the trip, H.T. seemed to be "a complete happy and normal teenage girl" who would sit with her dad and go places with him alone. H.T. could have approached her or Doug or "Sue" for help, but did not. Wendy had a great deal of alcohol in the house. Brian is not a violent person. His relationship with H.T. "always seemed close and loving." The same day that H.T. reported the crimes to the police, "Wendy went immediately to the bank and withdrew a lot of money from hers and Brian's account. She and [H.T.] went shopping at the outlet mall." She said this could be confirmed by bank statements and she would never go shopping with her daughter if her daughter revealed abuse like this. She talked with trial counsel and would have testified to these facts if called.

**Affidavit of James H. Logan II.** He is a lifelong friend of Brian, whose mother was friends with Brian's mother before they were born. Shortly before Brian's arrest, H.T. told him how much she appreciated her dad's teaching her to drive. When Brian and his family visited the Logans in Florida several months before Brian's arrest, H.T. "acted like a completely normal teenager" who had a "normal, loving, father-daughter relationship." Wendy tended to drink too much.

(Attachments to Post-Conviction Petition, ECF No. 9, PageID 323-35).

**\*5** The Twelfth District Court of Appeals considered the proffered affidavits on appeal [3] from the trial court's denial of post-conviction relief and concluded:

[*P13] Appellant argues that his attorney failed to present the testimony of several witnesses who he believes would have helped to "undercut the narrative" told by the victim and her mother during trial. In attempting to substantiate his claim, appellant submitted affidavits from witnesses who averred that appellant had a positive relationship with the victim. Appellant also seeks to diminish the credibility of the victim's mother by claiming that she is an erratic alcoholic. Furthermore, appellant submitted bank statements, which appellant argues, shows that the victim's mother took the victim on "an expensive shopping spree" after she reported the sexual encounters.

[*P16] Following review, we find the trial court did not err by denying appellant's petition for postconviction relief. Appellant's arguments are entirely speculative and amount to nothing more than an attempt to relitigate this matter utilizing a different trial strategy.

[*P17] As to the failure to call certain witnesses regarding appellant's relationship with the victim and the victim's mother, we note that a decision regarding whether or not to call witnesses falls within the ambit of trial strategy. *State v. Robinson*, 12th Dist. Butler No. CA2014-12-256, 48 N.E.3d 1030, 2015-Ohio-4649, ¶ 51. In this case, appellant fails to establish either prong of his ineffective assistance claim. There is little probative value to any evidence that appellant once shared a strong relationship with the victim, as the issue at trial was whether appellant had sexually abused her, a fact that appellant did not dispute during interviews with law enforcement. Furthermore, we decline to find ineffective assistance of counsel for appellant's attempt in this appeal to diminish the credibility of the victim's mother.

*State v. B.J.T.*, 2019-Ohio-1049.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court such as the ineffective assistance of trial counsel claim presented in the First Ground for Relief, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785, 178 L.Ed.2d 624 (2011); *Brown*

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 51

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

*v. Payton,* 544 U.S. 133, 140, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005); *Bell v. Cone,* 535 U.S. 685, 693-94, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

In deciding Thoma's ineffective assistance of trial counsel claim, the Twelfth District held that "[i]n a postconviction petition asserting ineffective assistance of counsel, the petitioner must first show that "his trial counsel's performance was deficient, and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." " *State v. B.J.T.,* 2019-Ohio-1049, ¶ 15, citing its own precedent *State v. Widmer,* 12th Dist. Warren CA2012-02-008, 2013-Ohio-62, ¶ 132, which in turn relies on the controlling Supreme Court precedent, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus Thoma's burden in habeas is to show that the Twelfth District's decision is an unreasonable application of *Strickland* or an unreasonable determination of the facts on the basis of the evidence presented.

**\*6** As to the uncalled lay witnesses, the Magistrate Judge agrees with the Twelfth District's assessment of the probative value of their proffered testimony. The issue at trial was whether Thoma digitally penetrated his daughter. Whether they had had in the past, even the relatively recent past, an apparently warm relationship does not speak to that critical issue. None of the proffered witnesses suggested any motive for H.T. to lie about her father's conduct. Nor do they offer, for example, alibi-type testimony that Thoma was not in the house with H.T. when she testified the abuse happened. None of them contradicted H.T.'s trial testimony with any proof she had made a prior inconsistent statement. And except for life-long friend Logan, they are all relatives of Petitioner.

Wendy Thoma testified she first learned of H.T.'s allegations from a police officer on April 21, 2016; H.T. herself did not tell her mother about the abuse that day (Trial Transcript, State Court Record, ECF No. 9-1, PageID 553). Wendy testified that when she next talked to Thoma, he asked for her to put money in an account so that he could bail himself out. She refused and said she would not do anything to help him. *Id.* at PageID 555-56. She testified that she had possession of Thoma's cellphone, read text messages recorded on it between

H.T. and Thoma, and then turned it over to the police. *Id.* at 556-57.

Wendy Thoma's actual testimony would hardly have been undermined by proof that she had a drinking problem. Presumably if she had been drunk on the witness stand, the trial judge would have dealt with it summarily. None of the witness affidavits suggest any motive she might have had to encourage H.T. to fabricate the incidents or any observed occasion when her drinking impaired her memory. Nor do they suggest any animosity between Wendy and Brian, who had been married for ten years at the time of the incidents [4], before she learned of the abuse. If Petitioner is suggesting that Wendy encouraged H.T. to fabricate the abuse and then lie about it, the Magistrate Judge believes it is significant that H.T. testified she told other people at school first instead of her mother, at least as to any claim that H.T. fabricated the abuse at Wendy's instance.

Thoma makes much of his sister's statement in her affidavit that Wendy withdrew a large amount of money from a joint account she had with Brian on April 21, 2016. Michelle Carrancejie offers no evidentiary foundation for this testimony. Indeed, Thoma's counsel exaggerates even what Carrancejie swore to. Thousands of dollars withdrawn from an account does not equate to thousands of dollars spent on clothes for H.T. The withdrawal is perfectly consistent with Wendy's testimony she would do nothing to help Thoma bail out. And the Reply suggests the inference that Wendy took H.T. shopping to reward her for lying to the police. However, the conduct is completely consistent with a mother's effort to comfort a daughter whom she has just learned was sexually abused by her father repeatedly over a six-month period.

On balance, the Twelfth District's characterization of the conclusions Thoma argued from the affidavits as "speculative" seems accurate or, at the very least, within the range of appropriate judicial evaluation of evidence.

**Failure to Elicit Medical Testimony**

On the same day she told police about the abuse, H.T. had a sexual assault examination at Dayton Children's Hospital which the Court understands to be common police practice when a person alleges she has been the victim of sexual misconduct. The examination allegedly "revealed no evidence of scraping, bleeding, scarring, or other vaginal damage." (Reply, ECF No. 15, PageID 901, citing State Court Record, Trial Tr., ECF No. 9-1, PageID 567 where

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 52

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

State's Exhibit 1 was identified.) The purportedly quoted language does not appear in the record at the cited location. In any event, the Twelfth District found that the examination revealed no abnormalities or injuries. The report was admitted in evidence, but Thoma faults his attorney for failure to subpoena the medical examiner or to "otherwise offer expert testimony to explain these findings." *Id.* at PageID 901.

**\*7** The Twelfth District on direct appeal found that the medical report was not inconsistent with H.T.'s testimony:

> The fact that there were no injuries or abnormalities found during H.T.'s examination on April 21, 2016, does not mean that appellant did not penetrate H.T.'s vagina when he sexually assaulted her. It merely indicates that appellant's assault of the victim in the early morning hours of April 21, 2016, did not cause any lacerations or observable physical harm to H.T.'s vaginal area.

*State v. B.J.T.,* 2017-Ohio-897, ¶ 28. On appeal from denial of the post-conviction petition, the court of appeals held again:

> [\*P18] We similarly find that appellant's trial counsel was not ineffective for failing to obtain a medical expert. It is well-established that medical testimony is not necessary to prove a sexual assault and, oftentimes, victims will have no symptoms of physical injury. See, e.g., *State v. Hall,* 12th Dist. Butler No. CA2012-01-014, 2013-Ohio-4427, ¶ 33 (the fact that a victim's medical exam was "normal" is not determinative of whether she was sexually abused). Here, the allegation is that appellant digitally penetrated the victim over a period of time. Physical injury was not required, nor would the lack of physical injury be necessarily probative in light of the allegations. As a result, appellant's

counsel was not ineffective for failing to obtain a medical expert or go into further detail regarding the medical report.

*State v. B.J.T.,* 2019-Ohio-1049, ¶ 18.

Thoma's claim with respect to any uncalled medical expert is even less persuasive than his claim about the uncalled lay witnesses. What would such an expert have testified to? No proposed medical testimony was presented with the post-conviction petition. H.T. did not claim her father scratched her or caused her to bleed, so the absence of such evidence in the medical report would not have contradicted her testimony. Thoma's hypothesis appears to be that a medical expert would have testified that the absence of scarring or bleeding would prove there had been no digital penetration, but the hypothesis is purely speculative – it is not backed up by any expert willing to testify to that effect.

**Failure to Have a Polygraph Examination Conducted**
Both Brian and Sue Thoma aver that trial counsel was asked to have a polygraph examination conducted; Brian avers that Mr. Ruppert said the results would be inadmissible. Regarding the failure to have a polygraph examination conducted, the Twelfth District wrote on post-conviction appeal:

**\*8** [\*P19] Finally, appellant's counsel was not ineffective for failing to request a polygraph examination, as such a decision was a matter of reasonable trial strategy. Concerns regarding a polygraph examination may very well have been more pronounced in this case, as appellant had already made several incriminating admissions. As we addressed in appellant's direct appeal, the evidence to support appellant's convictions was overwhelming. In text messages exchanged with the victim, appellant begged the victim not to tell anyone. Appellant promised "[a]bsolutely never will I be so f****** stupid again" and pleaded with the victim to "trust me when I tell you that this will never happen again." Appellant also admitted he made a "mistake" and touched the victim "in places she shouldn't be touched." Appellant admitted that he touched the victim's breasts and her vaginal area "skin to skin" with his hands. He stated he had touched the victim "maybe once a week for the last couple months," with the last time being "last night." He told detectives that the incidents occurred in the victim's bedroom in the middle of the night and that he used the light on his cellphone to see. Appellant made

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 53

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

additional admissions in jailhouse phone calls where he admitted to family members that he "touched [the victim] inappropriately" and that "she's not making anything up. It's not her fault."

*State v. B.J.T.,* 2019-Ohio-1049.

Thoma has made no showing that this conclusion is inconsistent with sound professional judgment in a case with recorded admissions as extensive as those here. He has also not shown generally that it was deficient performance for a defense attorney to fail to have a polygraph examination conducted in a case such as this. Finally, he has not shown what the results of a polygraph examination would have been. Thus the uncalled medical witness claim fails both the deficient performance and prejudice prongs of *Strickland*.

Thoma has not shown that the Twelfth District's decision on his claim of ineffective assistance of trial counsel is an unreasonable application of *Strickland*. It should therefore be denied on the merits.

**Ground Two: Ineffective Assistance of Trial Counsel in Plea Negotiations**
In his Second Ground for Relief, Thoma claims he received ineffective assistance of trial counsel in plea negotiations, particularly because Mr. Ruppert did not have the hypothetically favorable results of a polygraph examination to bargain with.

Because plea negotiation is functionally such an important part of the criminal process today, the Supreme Court has explicitly held that the right to effective counsel includes the right to effective assistance of counsel in plea negotiations. *Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012). What must an attorney do to meet that obligation? The Court has held that at a minimum, counsel must convey a plea offer to his or her client. *Frye, supra*. However, there is no evidence here that the State made an offer which Mr. Ruppert failed to convey to Thoma.

This Report quotes above the Twelfth District's reasoning about why it was not ineffective assistance to fail to have a polygraph examination conducted. In addition, the appellate court questioned the utility of such an examination in plea negotiations: "Moreover, appellant can present no evidence that the state would have agreed to reduced charges had

he taken a polygraph examination." *State v. B.J.T.,* 2019-Ohio-1049, ¶ 20.

As noted above under the First Ground for Relief, the only evidence about the polygraph in the case is Brian and Sue Thoma's averments that he asked for one and Mr. Ruppert advised against it. The Magistrate Judge accepts those averments as true. There is no evidence that Warren County prosecutors regularly consider favorable polygraph results in plea negotiations or that a minimum component of professional practice in criminal defense in sexual abuse cases in Ohio is to obtain such an examination.

There is also a dearth of evidence about plea negotiations at all. Petitioner does not claim he told Mr. Ruppert he was willing to bargain or what sentence he would have accepted. Indeed, present counsel points to nothing in the record to prove Mr. Ruppert did not attempt to negotiate. The burden of proving ineffective assistance of trial counsel for failure to plea bargain is on the Petitioner and Brian Thoma's Affidavit says nothing on the subject.

**\*9** The Twelfth District's decision on ineffective assistance of trial counsel in plea negotiation is not an unreasonable application of *Strickland* and should therefore be denied.

**Ground Three: Eighth Amendment Violation by Imposing Disproportionate Sentence**
In his Third Ground for Relief, Thoma asserts his sentence violates the Eighth Amendment because it is disproportionate to the sentences imposed on other persons for similar offenses.

**Procedural Default**
Respondent asserts this claim is procedurally defaulted because it was never fairly presented to the Ohio courts as a federal constitutional claim (Return, ECF No. 10, PageID 856-61). Thoma responds that he "exhausted this claim in state court by presenting both the operative facts and utilizing the terminology of Eighth Amendment case law in state court." (Reply, ECF No. 14, PageID 914).

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006);

Case: 25-1171   Document: 24   Filed: 06/18/2025   Page: 54

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

*Levine v. Torvik,* 986 F.2d 1506, 1516 (6th Cir.), cert. denied, 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith,* 581 F.3d 410, 418 (6th Cir. 2009).

There are occasions when a state court defendant will have made claims in the state courts which, while not explicitly invoking the United States Constitution, in fact fairly place before the state courts the substance, both facts and legal theory, of a claim or claims later made in habeas corpus.

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation.

*Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *accord, Whiting v. Birt,* 395 F.3d 602 (6th Cir. 2005); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000).

Thoma asserts that he "argued to each and every state court below that a 28-year consecutive sentence was disproportionate to the sentences handed down in similar cases and against similar alleged offenders." (Reply, ECF No. 15, PageID 914). While that statement is true on its face, it fails to grapple with the substance of the fair presentation requirement. Rather, we must inspect the presentation in detail.

On his initial direct appeal, Thoma argued in his Third Assignment of Error that imposing consecutive rather than concurrent sentences was contrary to Ohio law and that his sentence was "disproportionate to the crime committed." (Appellant's Brief, State Court Record, ECF No. 9, PageID 70). In the argument on this assignment of error, Thoma cited numerous Ohio cases but no federal cases; the Eighth Amendment is not mentioned.

**\*10** On his direct appeal after resentencing, Thoma again asserted his sentence of twenty-eight years was disproportionate to other sentences for those crimes [sexual battery and gross sexual imposition]." (Appellant's Brief, State Court Record, ECF No. 9, PageID 207). In support, he cited twenty-five Ohio cases and no federal cases. *Id.* at PageID 208-09. The Eighth Amendment is again not mentioned.

In his Reply, Thoma offers no analysis to show that he relied in state court on state cases employing Eighth Amendment analysis; as noted, he cited no federal cases at all. Nor has he shown that the pattern of facts in this case is "well within the mainstream of constitutional litigation." Instead, he appears to rely on the use of words like "disproportionate" in both Ohio sentencing case and federal Eighth Amendment cases and claim that they mean the same thing.

The Magistrate Judge disagrees. Ohio statutory law requires sentencing judges to consider certain factors in determining the length of a sentence and whether sentences for multiple crimes should be concurrent or consecutive. Thoma argued these statutes had not been complied with, not that his sentence violated the Eighth Amendment.

Of course, Ohio law exhibits an interest in making punishments proportionate to the crime committed. For that very reason the 1974 recodification of Ohio law classified felonies and misdemeanors into various degrees commensurate with the General Assembly's sense of a rough equivalence in seriousness. It is a model of reason in its pattern compared with federal criminal law which has never been codified on the same basis.[5] Moreover, a sentence can be reversed if the sentencing court does not consider the purposes and principles of felony sentencing (Ohio Revised Code § 2929.11) or the appropriate sentencing factors (Ohio Revised Code § 2929.12), giving a statutory basis for sentence review without any reference to the Eighth Amendment.

Petitioner relies on *Clinkscale v. Carter,* 375 F.3d 430 (6th Cir. 2004), but it is clearly distinguishable. Petitioner there had explicitly raised an ineffective assistance of trial counsel claim in the state courts and had cited *Strickland* as the standard. *Id.* at 438.

Case: 25-1171     Document: 24     Filed: 06/18/2025     Page: 55

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

Petitioner also relies on *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), but that case supports Respondent's position. Considering whether petitioner had fairly presented a Confrontation Clause argument to the state courts, the Sixth Circuit held:

> We are of the opinion that the petitioner did not "fairly present" his claim. In his direct appeal, the petitioner focused entirely on the applicability of Ohio's rape shield law. Ohio Rev. Code Ann. § 2907.02. He did not cite any federal precedent and his appellate brief only alleges that the trial judge's limitation on cross-examination denied him a "fair trial" and "due process." As this court recognized in *Franklin*, this is not sufficient to alert a state court that an appellant is asserting the violation of a specific constitutional right. While it is true that a few of the state cases cited by the petitioner on direct appeal contain references to the Confrontation Clause, the majority of those cases were concerned with Ohio evidence law. We do not think that a few brief references to the Confrontation Clause in isolated cases is enough to put state courts on notice that such a claim had been asserted. Thus, we hold that the petitioner failed to "fairly present" his Confrontation Clause claim to the Ohio courts.

**\*11** 228 F.3d at 682.

The Sixth Circuit has held that merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006); *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe,* 735 F.2d 684, 688-89 (2nd Cir. 1984). Merely using the word "disproportionate" fares no better. The Magistrate Judge concludes Thoma did not fairly present

an Eighth Amendment claim to the Ohio courts. His Third Ground for Relief is therefore procedurally defaulted.

**Merits Analysis**

In the alternative, Thoma's Eighth Amendment claim fails on the merits. It is true that the Supreme Court has said "The concept of proportionality is central to the Eighth Amendment." (Reply, ECF No. 15, PageID 914, quoting *Graham v. Florida,* 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)). But the quotation bespeaks more Justice Kennedy's penchant for grandiloquence than any holding of the case. [6] In determining what constitutes clearly established federal law, "we must consult 'the holdings, as opposed to the dicta, of [the Supreme] Courts' decisions as of the time of the relevant state-court decision.' " *Id.*, quoting *Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Ruimveld v. Birkett,* 404 F.3d 1006, 1010 (6th Cir. 2005).

Proportionality as a principle which has any bite in Eighth Amendment jurisprudence is found only in capital cases. For example, in *Graham, supra,* the Supreme Court held life without parole was always a disproportionate sentence for a juvenile offender. Justice Kennedy provided other examples in *Graham*:

> With respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. *Kennedy,* 554 U.S. at 438, 128 S. Ct. 2641, 171 L. Ed. 2d 525; see also *Enmund v. Florida,* 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982); *Coker v. Georgia,* 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977). In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18, *Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), or whose intellectual functioning is in a low range, *Atkins v. Virginia,* 536 U.S. 304,

Case: 25-1171   Document: 24   Filed: 06/18/2025   Page: 56

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

**\*12** 560 U.S. at 60-61, 130 S.Ct. 2011.

In contrast, discussing application of the Eighth Amendment to non-capital cases, Justice Kennedy wrote:

The Court's cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty.

In the first classification the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive. Under this approach, the Court has held unconstitutional a life without parole sentence for the defendant's seventh nonviolent felony, the crime of passing a worthless check. *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). In other cases, however, it has been difficult for the challenger to establish a lack of proportionality. A leading case is *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991), in which the offender was sentenced under state law to life without parole for possessing a large quantity of cocaine. A closely divided Court upheld the sentence. The controlling opinion concluded that the Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.,* at 997, 1000-1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (Kennedy, J., concurring in part and concurring in judgment). Again closely divided, the Court rejected a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's so-called three-strikes recidivist sentencing scheme. *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003); see also *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The Court has also upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses, *Rummel v. Estelle*, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980), and a sentence of 40 years for possession of marijuana with intent to distribute and distribution of marijuana, *Hutto v.*

*Davis*, 454 U.S. 370, 102 S. Ct. 703, 70 L. Ed. 2d 556 (1982) *(per curiam)*.

The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. 501 U.S. at 1005, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (opinion of Kennedy, J.). "[I]n the rare case in which [this] threshold comparison ... leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Ibid.* If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. *Ibid.*

**\*13** 560 U.S. at 59-60, 130 S.Ct. 2011.

Distilled for purposes of this case, the Supreme Court has not struck down a non-capital sentence as disproportionate since *Solem* in 1983. It is also impossible to distill a "holding" which can be stated as a rule from the subsequent cases. Is the rule that forty-one years for distribution of marijuana would be disproportionate? Moreover in a habeas case a District Judge cannot make his or her own *de novo* determination of how much is too much, but rather must determine whether the state courts' determination that this much is not too much is an objectively reasonable application of Supreme Court holdings.

Of course here we do not have an explicit ruling by the Twelfth District on any Eighth Amendment claim, but because Petitioner insists he fairly presented the claim, we must treat it as decided. And the Magistrate Judge does not believe the decision is unreasonable. If forty years for distribution of a relatively harmless substance like marijuana is not too much, surely twenty-eight years for incestuous child abuse cannot be too much. Thoma's Third Ground for Relief is without merit.

## Ground Four: Convictions Supported by Insufficient Evidence and Against the Manifest Weight of the Evidence

In his Fourth Ground for Relief, Thomas asserts his convictions are against the manifest weight of the evidence

Case: 25-1171   Document: 24   Filed: 06/18/2025   Page: 57

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

and supported by insufficient evidence. Respondent's defends this claim on the merits (Return, ECF No. 10, PageID 878).

Petitioner phrases this claim in terms of both insufficient evidence and manifest weight of the evidence. However, the manifest weight argument does not state a claim under the United States Constitution and therefore cannot form a basis for habeas relief. *Johnson v. Havener*, 534 F.2d 1232 (6th Cir. 1986).

In *State v. Thompkins*, 78 Ohio St. 3d 380, 678 N.E.2d 541 (1997), the Supreme Court of Ohio reaffirmed the important distinction between appellate review for insufficiency of the evidence and review on the claim that the conviction is against the manifest weight of the evidence. It held:

In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, (1982), *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson, supra*, 162 Ohio St. at 487, 124 N.E.2d at 149, 55 O.O. at 388-389. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.)

**\*14** When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines

whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

78 Ohio St. 3d at 387, 678 N.E.2d 541. In *State v. Martin*, 20 Ohio App. 3d 172, 485 N.E.2d 717 (Hamilton Cty. 1983)(cited approvingly by the Supreme Court in *Thompkins*), Judge Robert Black contrasted the manifest weight of the evidence claim:

In considering the claim that the conviction was against the manifest weight of the evidence, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. ...

*Martin,* 20 Ohio App. 3d 172, ¶3, 485 N.E.2d 717 of the syllabus.

Insufficiency of the evidence is a valid Fourteenth Amendment due process claim. An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068.

[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 58

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. 2781; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks,* 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard,* 11 F.3d 618,

620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

**\*15** *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer,* 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(en banc); *Parker v. Matthews,* 567 U.S. 37, 43, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 656 (6th Cir. 2010).

We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (per curiam).

And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Ibid.* (quoting *Renico v. Lett,* 559 U. S. 766, ——, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

2020 WL 6318213

*Coleman v. Johnson*, 566 U.S. 650, 651, 132 S.Ct. 2060, 182 L.Ed.2d 978, (2012)(per curiam); *Parker v. Matthews*, 567 U.S. 37, 43, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (per curiam). The federal courts do not make credibility determinations in reviewing sufficiency of the evidence claims. *Brooks v. Tennessee*, 626 F.3d 878, 887 (6th Cir. 2010).

Although the two standards are distinct, a state court finding that the verdict is not against the manifest weight of the evidence implicitly also holds that there is sufficient evidence. *Nash v. Eberlin*, 258 Fed. Appx. 761 (6th Cir. 2007); *Ross v. Miller*, No. 1:10-cv-1185, 2011 WL 2213802, 2011 U.S. Dist. LEXIS 65082 (N.D. Ohio May 10, 2011)(White, M.J.); *Hughes v. Warden*, No. 1:10-cv-091, 2011 WL 1980037, 2011 U.S. Dist. LEXIS 54131 (S.D. Ohio Apr. 27, 2011)(Merz, M.J.).

> While *Nash [v. Eberlin*, 258 Fed. Appx. 761 (6th Cir. 2007)] is not a published opinion of the Sixth Circuit and therefore not binding precedent, the Magistrate Judge will follow it and (1) not find any procedural default from Hughes' limitation of his state court argument to manifest weight, (2) liberally construe the Petition as making a claim of insufficiency of the evidence and (3) read the state court of appeals' decision that the conviction was not against the manifest weight of the evidence as "necessarily impl[ying] a finding that [Hughes'] conviction was also supported by sufficient evidence." *Id. at 762*. See also *State v. Lee*, 158 Ohio App. 3d 129, 2004 Ohio 3946, 814 N.E.2d 112, 115 (Ohio App. 9th Dist. 2004), cited in *Nash* at 765,.

*Hughes v. Warden*, 2011 WL 1980037, 2011 U.S. Dist. LEXIS 54131(S.D. Ohio Apr. 27, 2011), adopted, 2011 WL 1979667, 2011 U.S. Dist. LEXIS 54132 (S.D. Ohio May 20, 2011).

The question in habeas, then, is whether the Twelfth District's decision on Thoma's insufficiency and manifest weight claims is an objectively unreasonable application of *Jackson, supra.* Thoma combined those claims in his First Assignment of Error on direct appeal which the Twelfth District decided as follows:

**Sexual Battery**

**\*16** [*P25] Appellant was convicted of sexual battery in violation of R.C. 2907.03(A)(5), which provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or

guardian, custodian, or person in loco parentis of the other person." Sexual conduct includes "without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

[*P26] Appellant argues the state failed to present evidence of penetration "beyond H.T.'s subjective testimony, and all other objective evidence points to the opposite conclusion." He contends that because the medical records from H.T.'s sexual assault examination did not show abnormalities or injuries, "the medical report lends credibility to [his] statements that no penetration occurred."

[*P27] However, after reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for sexual battery are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence proving all the essential elements of the offenses beyond a reasonable doubt. The state introduced testimony from H.T. that appellant engaged in sexual conduct by digitally penetrating her vagina in September, October, November, and December 2015, and in January, February, March, and April 2016. For all but the September 2015 offense, H.T. testified appellant entered her bedroom while she was sleeping and put his fingers into her vagina or touched her "inside her vagina." As for the September 2015 offense, H.T. explained appellant put his hands between her legs, inside her shorts and underwear, and put his fingers into her vagina while she was lying on the floor in the living room.

[*P28] Contrary to appellant's arguments, H.T.'s testimony is sufficient, on its own, to establish the element of penetration. " 'There is nothing in the law that requires that a sexual assault victim's testimony be corroborated as a condition precedent to conviction.' " *State v. Robinson*, 2015-Ohio-4533, ¶ 41, 48 N.E.3d 109, quoting *State v. West*, 10th Dist. Franklin No. 06AP-111, 2006-Ohio-6259, ¶ 16. See also *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714, *2, 1996 Ohio App. LEXIS 2245, *6 (May 28, 1996) (holding that "[e]ven without corroborating medical evidence, a victim's testimony that the perpetrator placed his penis in her vagina constitutes penetration"). Further, the medical report was not inconsistent with H.T.'s testimony. The fact that there were no injuries or abnormalities found during H.T.'s examination on April 21, 2016, does not mean that appellant did not penetrate H.T.'s vagina when he sexually

Case: 25-1171   Document: 24   Filed: 06/18/2025   Page: 60

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

assaulted her. It merely indicates that appellant's assault of the victim in the early morning hours of April 21, 2016, did not cause any lacerations or observable physical harm to H.T.'s vaginal area.

[*P29] Here, the trial court, as the trier of fact, "was in the best position to judge the credibility of witnesses and the weight to be given the evidence." *State v. Patterson*, 12th Dist. Butler No. CA2001-09-222, 2002-Ohio-5996, ¶ 12. The court was entitled to weigh H.T.'s testimony that appellant digitally penetrated her vagina against the version of events appellant testified to at trial. Though appellant denied ever penetrating H.T.'s vagina and testified that there were only three instances in which he inappropriately touched H.T., with two of those instances being accidental, appellant's April 21, 2016 statement to law enforcement indicated he had been intentionally touching H.T. inappropriately for "maybe once a week for the last couple months." Appellant's convictions are not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence offered by the prosecution. See *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17; *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 42.

**\*17** [*P30] Accordingly, given the evidence presented at trial, we find that appellant's convictions for sexual battery are supported by sufficient evidence and are not against the weight of the evidence.

*State v. B.J.T.,* 2017-Ohio-8797, 101 N.E.3d 62 (12th Dist. Dec. 4, 2017).

**Sexual Battery**

To prevail on his claim as to the sexual battery convictions, Thoma must show that this is an objectively unreasonable application of *Jackson, supra*. To attempt to do so, Thoma asserts:

> The State presented no evidence of penetration beyond H.T.'s subjective testimony, and all the objective evidence points to the opposite conclusion: that Thoma did not penetrate H.T. as required to convict him of sexual battery.... The only objective evidence of penetration, or any physical harm, is the medical report conducted a few hours after the April 21 incident. That report showed no signs of penetration or other injury. *Id.* at ¶ 28 (noting that there were "no injuries or abnormalities found during H.T.'s examination on April 21, 2016").

(Reply, ECF No. 15, PageID 916-17).

This argument is unpersuasive. First of all, all testimony is, of necessity, subjective. Second there is no objective evidence at all. The medical report gives the observations of the examiner which themselves are subjective, i.e., dependent on the observations of the reporting person. Third, the claim that the "report showed no signs of penetration" is facially true, but it only supports Thoma's testimony that there was no penetration if we also know the likelihood that penetration would leave some observable sign. There is no evidence in the record to that effect, either the trial record or the post-conviction record.

The substance of Thoma's argument is that a victim's testimony of penetration is insufficient for conviction. That is not the law in Ohio, as the Twelfth District pointed out, and the federal Constitution does not require that it be the law.

Thomas argues that no reasonable person could find him guilty on the word of his daughter alone (Reply, ECF No. 15, PageID 917). This argument fails to account for H.T.'s other testimony of surrounding facts: the abuse virtually always happened in her bedroom and the early hours of the morning. Thomas himself, while he doe not admit penetration, admits placing his hand in a location from which penetration would be a very simple act. And at one point he said H.T. was not making anything up and apologizing profusely about what happened. Why was it unreasonable for the finder of fact to credit H.T.'s testimony?

On the gross sexual imposition counts, the Twelfth District wrote:

**Gross Sexual Imposition**

[*P31] Appellant was convicted of seven counts of GSI in violation of R.C. 2907.05(A)(5), which provides that

> [n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition or because of advanced age.

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 61

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, public region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "[S]leep is a 'mental or physical condition' sufficient to substantially impair a victim's ability to resist [or consent to] * * * sexual contact within the meaning of R.C. 2907.05(A)(5)." *State v. Porter*, 9th Dist. Medina No. 12CA0061-M, 2013-Ohio-3969, ¶ 19. See also *State v. Coran*, 2d Dist. Clark No. 2014-CA-17, 2014-Ohio-4406, ¶ 6, fn. 3.

**\*18** [\*P32] Appellant argues the state failed to prove the sexual arousal or gratification element of GSI, as the only evidence of sexual gratification offered by the state was H.T.'s mother's testimony that on one occasion, she woke up one night to find appellant masturbating beside her in bed. Appellant argues this testimony is "irrelevant and unrelated to [his] alleged conduct." Appellant argues that because H.T.'s mother's testimony is not linked to any specific date, "there is no evidence that this happened because of [his] actions concerning H.T."

[\*P33] "While an essential element of the offense of gross sexual imposition is that the act is for the 'purpose of sexual arousal or gratification,' there is no requirement that there be direct testimony regarding sexual arousal or gratification." *State v. English*, 12th Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 69. "Whether the touching was performed for the purpose of sexual arousal or gratification is a question of fact to be inferred from the type, nature, and circumstances of the contact." *State v. Williams*, 12th Dist. Warren No. CA2012-08-080, 2013-Ohio-3410, ¶ 33. In making this determination, the trier of fact is "permitted to infer what the defendant's motivation was in making the physical contact with the victim." *Robinson*, 2015-Ohio-4533, ¶ 43, 48 N.E.3d 109. "If the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *State v. Pence*, 12th Dist. Warren No. CA2012-05-045, 2013-Ohio-1388, ¶ 78.

[\*P34] Contrary to appellant's arguments, we find that his convictions for GSI are supported by sufficient evidence and are not against the manifest weight of the evidence as the state presented testimony and evidence proving beyond a reasonable doubt all the essential elements

of GSI, including the sexual arousal or gratification element. In addition to H.T.'s mother's testimony that she once woke up in the middle of the night to appellant masturbating, the state introduced evidence that appellant repeatedly entered H.T.'s bedroom in the middle of the night while H.T. was alone and sleeping. Dressed only in his underwear, appellant would touch H.T.'s buttocks, chest, and vagina while using a cellphone to see what he was doing. After the first time appellant assaulted H.T., he told her she "better not tell anyone that it happened," and months later, after H.T. informed appellant that she was going disclose the abuse, he begged her to remain silent. Looking at appellant's behavior and the type, nature, and circumstances surrounding the sexual contact, we find that the finder of fact could properly infer that appellant's motivation in making physical contact with H.T.'s erogenous zones was sexual arousal or gratification. The finder of fact was entitled to conclude that there was no innocent or nonsexual explanation for appellant's conduct. See *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 17; *State v. Wilson*, 192 Ohio App.3d 189, 2011-Ohio-155, ¶ 47, 948 N.E.2d 515 (11th Dist.).

*State v. B.J.T.*, 2017-Ohio-8797, 101 N.E.3d 62.

To prevail on his claim as to the gross sexual imposition counts, Thoma must again show this decision is an objectively unreasonable application of *Jackson*. In his attempt to do so, Thoma argues the State had to show the purpose of his touchings of H.T.'s erogenous zones was sexual gratification. He claims he "consistently denied any sexual motive[7], and the State had no actual evidence of sexual motive during the alleged acts."

**\*19** The trial judge found Thoma's denial of sexual intent unpersuasive and the Magistrate Judge agrees that finding was reasonable. It is completely reasonable to infer from common knowledge of human behavior that a grown man who repeatedly puts his hand on the pubic region of a teenage girl and, when confronted, apologizes profusely, had a sexual intent in what he did.

In sum, the Twelfth District's conclusion that there was sufficient evidence of sexual battery and gross sexual imposition is a reasonable application of *Jackson v. Virginia.* Thoma's Fourth Ground for Relief should be dismissed on the merits.

## Conclusion

Case: 25-1171    Document: 24    Filed: 06/18/2025    Page: 62

Thoma v. Warden, Pickaway Correctional Institution, Not Reported in Fed. Supp. (2020)

2020 WL 6318213

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6318213

---

## Footnotes

1   No date is given, but the Court takes judicial notice that Easter in 2016 was March 27 in the Roman calendar which is typically followed in the United States. That would put the visit in the midst of the period of abuse.

2   She describes the trip as coinciding with her daughter's spring break. This is consistent with her mother's placing the trip at Easter.

3   The trial court had rejected the post-conviction claims on the basis of Ohio criminal *res judicata* doctrine, but the Twelfth District considered the proffered evidence on the merits. State v. B.J.T., 2019-Ohio-1049, ¶ 12.

4   The Reply refers to Wendy as Brian's "ex-wife," (ECF No. 15, PageID 900), but they were still married on April 21, 2016, and none of the trial testimony or tendered post-trial affidavits speak of any marital discord prior to that date.

5   As unlikely bedfellows as Ted Kennedy and Strom Thurmond once collaborated on such a project, unsuccessfully.

6   Compare *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), where Justice Kennedy purported to recognize a substantive due process right to engage in any private sexual conduct by consenting adults with *Lowe v. Stark County Sheriff*, 663 F.3d 258 (6th Cir. 2011), where the court upheld a conviction for incest with a consenting adult stepdaughter, saying it was unclear that *Lawrence* announced a new fundamental right or the proper standard of review to apply. Justice Kennedy's tendency to write broad generalities was the frequent subject of criticism by Justice Scalia. Lower court judges can only hope that Justice Barrett will follow Justice Scalia, for whom she clerked, in this attention to detail.

7   Thoma offers no record references for these "consistent denials." S. D. Ohio Civ. R. 7.2(b)(5) provides: "**Pinpoint Citations.** Except for Social Security cases, which must comply with S.D. Ohio Civ. R. 8.1(d), **all filings in this Court that reference a prior filing must** provide pinpoint citations to the PageID number in the prior filing being referenced, along with a brief title and the docket number (ECF No. _____ or Doc. No. _____) of the document referenced." If those denials are in the record, they should have been cited. If they are not in the record, the Court cannot consider them.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.